In re The First-Central Trust Co.:
Andress, Exrx., et al., Appellants, v. Carter et al.,
Appellees.

(No. 3660—Decided July 5, 1944.)

*Messrs. Beery, Underwood, Ryder & Kroeger, Messrs. Buckingham, Doolittle & Burroughs, Mr. John C. Frank, Mr. W. J. Laub, Messrs. Musser, Kimber & Huffman, Messrs. Nelan & Walsh, Mr. W. E. Pardee, Messrs. Slabaugh, Seiberling, Guinther & Pflueger* and *Messrs. Wise, Roetzel & Maxon,* for appellants.

*Messrs. Brouse, McDowell, May & Bierce, Messrs. Dinsmore & Whittemore, Messrs. Gottwald, Hershey & Hatch* and *Messrs. Ormsby, Smith & Ormsby,* for appellees.

*Mr. Thomas J. Herbert,* attorney general, and *Mr. Fred E. Renkert,* for the Superintendent of Banks.

MATTHEWS, J.  This appeal brings before the court a controversy between the depositors on the one hand and the shareholders on the other as to the disposition of a balance of $1,243,000 resulting from the liquidation of the assets of The First Central Trust Company and the collections from its shareholders upon their double liability.  In the hour of their common peril, depositors and shareholders agreed without a single dissent on the manner of resumption of business by the bank, and the liquidation of the assets and enforcement of double liability. The Superintendent of Banks has proceeded thus far in the liquidation, in accord-

ance with the agreement embodied in the court order and has paid depositors the full value of their claims, and, apparently, those shareholders who continued as such have had their faith justified by seeing The First Central Trust Company restored to a condition of financial soundness and prosperity. The removal of the centripetal force of the common peril and time for a more deliberate consideration of the terms of their agreement in the light of developments have produced different conclusions as to its legal effect upon the rights of the parties. The depositors assert that they are entitled, by virtue of their original status as creditors, to the fund in payment of interest upon their claims, whereas, the shareholders assert that the depositors, if otherwise entitled to interest, which they deny, are barred therefrom by their agreement, the action of the Superintendent of Banks and the order of the court approving the terms under which The First Central Trust Company was permitted to resume business.

It is, therefore, necessary to consider what was done in the process of liquidation.

Acting under emergency legislation, passed on February 27, 1933 (Section 710-107a, General Code), the Superintendent of Banks on the following day notified The First Central Trust Company to comply and to advise him of the percentage of deposits that he could safely authorize to be withdrawn. Acting on the information furnished, the superintendent authorized the withdrawal of one per cent. On March 4, 1933, the President of the United States ordered all banks closed. The First Central Trust Company remained closed until April 8, 1933, but remained in possession of its assets. On April 8, 1933, the Superintendent of Banks, acting under authority of emergency legislation (Section 710-88a, General Code) effective March

31, 1933, appointed a conservator of the bank who took possession of the assets and continued to hold possession until June 21, 1933, when the superintendent took possession and title to the assets for the purpose of liquidation. While the conservator was in possession, he allowed depositors to withdraw one per cent of their deposits. The Superintendent of Banks continued that policy.

As soon as forms were prepared and the necessary data assembled, certificates of claim were made available to depositors. These certificates showed the amounts due each depositor as of June 21, 1933, the date when the superintendent took possession and title, for the purpose of liquidation. In determining this amount, the conventional interest was included to that date in the instances where the contract expressly provided for interest. On demand deposits, no interest was included. Of course, the one per cent withdrawn was deducted. Not all depositors availed themselves of the opportunity to obtain certificates of claim. Upon obtaining certificates of claim, the depositors surrendered the original evidence of indebtedness and it was marked "canceled" and stamped with the legend "certificate of claim issued in lieu of this book."

Shortly after taking possession for the purpose of liquidation, the superintendent assessed the shareholders the full amount of their liability.

Early in 1933, the Legislature enacted Section 710-89a of the General Code, in an effort to provide a means for banks that had been closed by the superintendent to resume business. By this section, the superintendent, with the approval of the Court of Common Pleas, is authorized to permit the resumption of business by the bank upon such conditions as he deems necessary. Such conditions might include "reasonable restrictions upon the withdrawal of deposits and the payment of other liabilities, and may also provide for

a proportionate reduction of the deposit and other liabilities of such bank and the substitution, in lieu of the amount by which such deposits and other liabilities are reduced, of trust or participation certificates in assets set aside for the payment thereof; provided that certificates shall in no event impose any liability for the payment thereof upon such bank as reopened except to the extent of the assets so segregated.''

The section also provides ''that a fair and equitable proportion of the assets of such bank and of the stockholders' double liability payments in the possession of the Superintendent of Banks, in proportion to the aggregate amount of their claims, to be ascertained by the court, shall, for the benefit of those depositors and creditors who shall file with the clerk of the court written objections to the proposed resumption of business by such bank on such conditions, be disposed of as the court shall direct or be left in the possession of the Superintendent of Banks to be liquidated.''

Failure to file written objections within the prescribed time was made conclusive that the depositor had consented.

At about the same time there was enacted as a part of Section 710-91, General Code, the provision that upon posting of notice by the superintendent that he had taken possession, ''interest on deposits shall thereupon cease to accrue at the rate specified in the contracts of deposit, but without prejudice to the rights of depositors to receive interest, with other creditors, from the date of such posting, out of the funds produced by the liquidation of such bank, before distribution thereof is made to shareholders on their shares.''

The effort to devise a plan, acceptable to the superintendent, for resumption of business culminated in the plan that was finally submitted to the Court of Common Pleas of Summit county and approved by it on the 2nd day of December, 1933. The entire plan

6

was incorporated in the journal entry. Without considering whether the journal entry, incorporating the plan, is a final adjudication and, therefore, binding upon the parties on that ground, we are clear that the parties deliberately made it the final and complete expression of the agreement of resumption of the bank and liquidation of the assets left with the Superintendent of Banks, and having thus integrated their agreement, the writing supersedes all prior and contemporaneous negotiations on the subject (Restatement of Contracts, 307, Section 228) and their rights must be determined by ascertaining the meaning that would be attached thereto by a reasonably intelligent person "acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration" (*Idem,* 310, Section 230).

The plan for resumption of business was rather complicated, but in broad outline it provided for the reduction of the liabilities of the resuming bank to 25 per cent of the liabilities of the bank when the superintendent took control for the purpose of liquidation, and this 25 per cent was to be made available to depositors immediately from funds obtained by the superintendent from the Reconstruction Finance Corporation, secured by mortgage upon all the assets of the bank in his hands. The capital stock was reduced to 10 per cent of its existing capitalization. The old certificates of stock were invalidated without, however, affecting the double liability of the shareholders. New certificates for the reduced par value were issued and placed in escrow and, instead of paying for this stock, the shareholders bought debentures of the reorganized bank to the extent of $500,000 payable 15 years after date, and these debentures were delivered to the Superintendent of Banks, the purpose being to avoid disturbing the then status of the double liability. The

debentures constituted a debt of the reorganized bank, junior to the claims of its depositors and creditors.

The Superintendent of Banks delivered to the reorganized bank $1,300,000 in cash, and assets which constituted its capital, surplus and undivided profits.

Under the plan, the equity, subject to the lien of the Reconstruction Finance Corporation to secure it for the loan necessary to finance the plan, in all the assets of the bank, together with the assessed shareholders' liability, capital debentures, dividends, if any, upon the capital stock of the reorganized bank and the capital stock itself, was set aside in the hands of the superintendent for the payment of the ''remaining 75 per cent owed to known depositors and creditors of the present bank. Participating certificates in such assets, bearing no interest, will be issued to the depositors and creditors by the Superintendent of Banks, on request of any one entitled thereto, and such certificates shall be in lieu of the amount by which the deposit and other liabilities owed to the holder have been reduced. The amounts by which the deposit and other liability of the resuming bank are so reduced, whether evidenced by participation certificates or not, shall in no sense be an obligation of the resuming bank, and no liability shall be imposed upon it for the payment thereof, but such amounts shall be paid only out of the assets so set aside in the hands of the Superintendent of Banks.''

There are certain other phrases used in the plan of resumption that will be noticed as having some tendency to clarify the intent as to the nature and extent of the depositors' rights in or against the segregated assets.

The new certificates of stock of $5 par value per share were to be placed with the National City Bank to remain there for three years, at the end of which if ''depositors and creditors have not been fully paid''

the certificates were to be delivered to the Superintendent of Banks who was to sell sufficient to "complete full payment to said depositors and creditors." No shareholder was entitled to any such certificate or earnings therefrom "unless and until their full stockholders' liability now assessed plus $5 per share for each share of the resuming bank has been paid, or until depositors and creditors have been paid in full."

At several other places in the plan, certain action with reference to the assets in the hands of the Superintendent of Banks was made contingent upon depositors and creditors being "paid in full." Clearly, the shareholders were to receive nothing until that took place and there was no provision made for distribution of any surplus after payment of depositors and creditors although it is implied in the provision for an adjustment between shareholders who had paid unequal amounts on their double liability out of any surplus left after depositors and creditors had been "fully paid."

The event shows that there is a surplus after paying depositors and creditors the par value of their claims without interest. Whether there is an actual surplus to be returned to shareholders depends upon whether demand depositors are entitled to interest. That is the question presented by this appeal.

While many details were involved in the resumption and liquidation, it is believed that the foregoing statement sets forth the facts essential to be considered in the disposition of the issues presented.

Let us consider first the claim of demand depositors for interest against the assets of the bank in the absence of any surrender of the claim.

We believe the uniform tenor of the cases, both state and federal, is set forth in 7 American Jurisprudence, 536, Section 744. The statement is:

"Accordingly, the general rule is that interest on

general claims against an insolvent bank will not be computed for the period after the bank passes into the hands of a receiver or liquidator where the assets of the bank are not sufficient to pay the principal of all the debts. If, however, the assets of the insolvent bank do in fact turn out to be sufficient to meet all demands and leave a surplus over, interest on all claims will, in the absence of a statutory prohibition, be allowed out of the surplus to the creditors for the period during which the insolvent bank has been in the hands of the receiver or liquidator."

See, also, *Ticonic National Bank* v. *Sprague,* 303 U. S., 406, 82 L. Ed., 926, 58 S. Ct., 612.

And it seems to us that the right of depositors to be paid interest is clearly recognized by Section 710-91, General Code, already noted.

Next, can this right to interest be asserted against the shareholders to the extent of their super-added liability?

By Section 3 of Article XIII of the Constitution of Ohio, as in force at the time the Superintendent of Banks took possession and title, it was provided that "stockholders of corporations authorized to receive money on deposit shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such corporations, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares."

We are concerned here with the rights of those depositors with whom the bank made no express contract relating to interest. Their rights as against the bank are fixed by Section 8305, General Code, which provides that "when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, or settlement between parties, upon all verbal contracts entered into, and

upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of a contract, or other transaction, the creditor shall be entitled to interest at the rate of six per cent per annum, and no more.''

This statute was an implied term of the contract of depositors and created an obligation of the bank to pay interest at the statutory rate after their claims became due and payable. The obligation was contractual.

It is said, however, that a demand was necessary to place the bank in default, and until that transpired, the deposit was not due and payable. However, it is a general rule that no demand is necessary before action is filed on a claim due on demand and that interest runs from the commencement of the action notwithstanding there has been no prior demand. The filing of the action is the demand. 30 American Jurisprudence, 35, Section 46. And when the affairs of a bank are so managed that it becomes insolvent it deprives itself of the power to pay a single depositor without violating the rights of every other depositor and creates a situation requiring state action to enforce the rights of all depositors, and, when the state official takes charge for that purpose, his action is in the nature of a writ of execution running in favor of all creditors and claimants. 7 American Jurisprudence, 513, Section 709. No other remedy is available to any depositor in that situation. Any other demand would be vain. We think all the analogies point to the accrual of interest from that date.

And when the nature of the obligation is considered, that it is for a liquidated amount, and that it arises out of contract, one of the implied terms of which is that interest will be paid upon the amount from the time it becomes due and payable, can it be doubted that it comes within the meaning of ''contracts, debts

and engagements'' of the banks for which shareholders are made liable to an amount equal to the par value of the stock? It is our view that they are clearly liable.

That brings us to a consideration of whether the depositors are barred from interest by the terms of the plan of resumption and liquidation consented to by them, approved by the superintendent and by the court through its journal entry.

We are of the opinion that the plan involved sufficient changes in the legal rights and duties of the shareholders to furnish adequate consideration for the relinquishment of rights by the depositors, but we do not place our decision that the plan was binding upon that ground. We hold that after such a plan has been adopted and acted upon by the parties-depositors, shareholders, Superintendent of Banks and the court, and the liquidation administered for more than ten years, it is too late to question the binding quality of the plan. All parties are estopped regardless of whether the plan contains all the elements of a binding contract. The depositors have received the principal of their claims and the shareholders have also received benefits in the process of administering the estate under the terms of the plan. They have not merely acquiesced, they have actively participated. Certainly, such conduct, relied upon by the thousands of depositors, the shareholders, the Superintendent of Banks, and the court, representing the public, is ample basis for an estoppel.

The binding quality could be placed on a different ground, or, perhaps, stated in different legal nomenclature. Section 90 of Restatement of Contracts, 110, is:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee

and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.''

We hold, therefore, that the original rights and liabilities of the parties have been modified to the extent expressed in the plan and as construed in the light of the surrounding circumstances, but to no greater extent. We, therefore, turn to a consideration of the plan to determine the extent, if any, it shows an intent to surrender the right to interest out of the assets in the hands of the Superintendent of Banks.

We have quoted such provisions of the plan as seem to shed, or are claimed to shed, some light upon the intent. We find the light very uncertain. At no place is there any statement that the depositors should surrender or waive their rights to interest as against the shareholders, or as against the assets left with the Superintendent of Banks. Those assets were left with him to pay the entire 75 per cent of ''the present deposits and other liabilities.'' At another place it is recited that such of the new certificates should be sold as are required ''to complete full payment to said depositors and creditors.'' And in another place, and the only place where it is even intimated that shareholders have any rights in the fund and that is *inter se,* it is recited that these rights shall only arise ''if and when all depositors and creditors of the present bank have been fully paid.''

But it is said the plan provided for the issuance of ''participation certificates in such assets, bearing no interest'' and that this is an express relinquishment of the claim for interest. A reading of that entire paragraph leads to the conclusion that the reference to certificates and interest was for the purpose of indicating the rights of the depositors among themselves and not as against shareholders, and that the draftsmen of the plan must have had in mind the provisions

of Section 710-91, General Code, on that subject. In the last sentence of the paragraph the reference is not to the amount stated in the certificates, but rather to the amount by which the deposits and other liabilities of the resuming bank had been reduced which would include interest and the assets set aside in the hands of the Superintendent of Banks, which constituted the fund out of which payment was to be made. To say the least, this language leaves in doubt the intention of the parties. Notwithstanding the use of the word ''interest'' in the manner indicated, it cannot be said that it is a direct and unequivocal waiver of the right to interest upon the deposits if funds were available to pay it.

It is significant that the depositors did not agree to accept certificates. They were made available if they chose to request them.

It is also significant that the court in providing for the issuance of ''trust or participation certificates'' omitted the phrase ''bearing no interest.'' And the characterizing of the documents as trust or participation certificates indicates that the dominant thought was to express the proportionate share, rather than the amount.

Furthermore, as these assets were set aside for depositors and they were made the beneficiaries to whom alone trust certificates were to be issued, a strictly legal interpretation would lead to the conclusion that no matter how large a sum was realized, depositors would be entitled to all of it, even though they received more than their total claims with interest. There is only the faintest hint that shareholders under any circumstances would have any right to any part of these assets.

Of course, the truth is that no one thought the assets would produce the principal of the depositors'

claims and that accounts for the indefiniteness of the plan on this subject.

The third and fourth paragraphs of the syllabus of *White Co.* v. *Canton Transportation Co.*, 131 Ohio St., 190, 2 N. E. (2d), 501, are as follows:

"Where a waiver comes after a breach of the original contract by the party claiming the benefit of the waiver, it should receive, not only careful but serious consideration at the hands of courts, as such an arrangement is diametrically opposed to sound business principles.

"He who affirms a waiver must prove it, and in so doing he must prove a clear, unequivocal, decisive act of the party against whom the waiver is asserted, showing such a purpose or acts amounting to an estoppel on his part."

See, also, *Allenbaugh* v. *City of Canton,* 137 Ohio St., 128, 28 N. E. (2d), 354.

In 27 Ruling Case Law, 910, Section 6, it is said:

"In accordance with the general rule as to the burden of proof, it devolves upon the party claiming a waiver to prove the facts on which he relies for such waiver. A presumption of the relinquishment of a known right cannot be rested on a presumption that such right was known. A waiver must be clearly proved, but this may be effected by various species of evidence. Thus it may be proved by express declaration or agreement, or by acts and conduct manifesting an intent and purpose not to claim the supposed advantage."

As the depositors had a right to interest upon default, the burden of proof rested upon those claiming its relinquishment to prove it by at least the greater weight of the evidence. We are of the opinion that they failed to sustain the burden and that, therefore, the trial court was right in holding that the fund in the hands of the Superintendent of Banks should be

devoted to the payment of interest on the deposits.

As the appellants agreed to a reduction of this appeal to one of law only, it will be so considered, and the judgment of the trial court affirmed.

*Judgment affirmed.*

Ross, P. J., and HILDEBRANT, J., concur.

Ross, P. J., HILDEBRANT and MATTHEWS, JJ., of the First Appellate District, sitting by designation in the Ninth Appellate District.