In re Harshey.

[Cite as In re Harshey (1975), 45 Ohio App. 2d 97.]

(No. 34210—Decided July 31, 1975.)

*Mr. Arthur L. Cain* and *Mr. Robert Bruce Henn,* for appellant.
*Mr. Charles Cohen,* for appellee.

Jackson, J. Appellants, Mr. and Mrs. William J. Harshey, appeal from a judgment of the Probate Court of Cuyahoga County denying their petition for the adoption of Gary Harshey (hereinafter Gary).

Appellants had, on February 1, 1973, applied to the Cuyahoga County Welfare Department to adopt "a child." Upon learning from a foster parent, Mrs. Kocsis, that one of her foster children, Gary Elledge, was available for

adoption, the Harsheys petitioned to adopt Gary Harshey.[1]

Mrs. Kocsis, a distant relative of the Harsheys was an independent licensed foster mother. She had adopted Gary's older half-brother, Nick, and renamed him "Freddy." Gary's mother had placed Gary in the physicial custody of Mrs. Kocsis, who had planned to adopt Gary also until she became pregnant with twins. At this time, she informed the Harsheys that Gary was available for adoption.

Mrs. Kocsis occasionally permitted the Harsheys to take Gary with them for short visits, including five days in April when Mrs. Kocsis was in the hospital having twins, and several subsequent weekends.

After taking Gary for these visitations, the Harsheys decided that they would like to adopt him. On August 9, 1973, appellants filed a petition for the adoption of Gary Harshey. Thereafter, on August 24, 1973, the Juvenile Court of Cuyahoga County found that Gary Elledge was a neglected child and committed him to the permanent care and custody of appellee, the Cuyahoga County Welfare Department, for the purpose of adoption.

Appellee then filed a motion to dismiss the Harsheys' petition to adopt Gary. Without ruling on the suitability of the Harsheys to adopt Gary, the Probate Court granted appellee's motion to dismiss appellants' petition to adopt. The apparent rationale of the Probate Court's decision was that since the Welfare Department had not consented to the adoption as required in R. C. 3107.06, the Probate Court was without jurisdiction to grant the adoption. Citing *State, ex rel. Portage County Welfare Dept.,* v. *Summers* (1974), 38 Ohio St. 2d 144, we reversed this judgment of the trial court and ordered the cause remanded for a full hearing to be conducted in accordance with R. C. 3107.09, and our opinion, *In re Harshey* (1974), 40 Ohio App. 2d 157.

[1]As required in R. C. 3107.03(D) Gary Elledge was referred to in the petition for adoption as Gary Harshey, the name by which he would be known were the petition granted.

Upon remand, in October of 1974, the Probate Court conducted a hearing on appellants' petition for the adoption of Gary. At this hearing, employees of the Cuyahoga County Welfare Department did give some testimony indicating that the Harsheys were not suitable adoptive parents. Patricia Zaccaro, a social worker from the adoption department of the Cuyahoga County Welfare Social Services Division, made a home study of the Harsheys. This study was done in relation to the suitability of the Harsheys as adoptive parents for the subject child, Gary. Patricia Zaccaro expressed reservations as to whether the Harsheys were emotionally fit to be adoptive parents. Ann Cowan, Patricia Zaccaro's supervisor was also of the opinion that the Harsheys were not suitable adoptive parents for Gary. Ann Cowan's opinion was not based upon first hand observations, but upon the information related to her by Patricia Zaccaro.

The trial court rejected all of the negative testimony concerning the suitability of the Harsheys as adoptive parents. In its opinion,[2] the Probate Court made the following observations concerning the suitability of the Harsheys:

"The Court has heard a great deal of testimony regarding the quality of the suitability of the Harsheys. Applying that testimony to the standards of maturity, stability, financial ability and love of children, this young couple comes through with flying colors. Mr. Harshey is a fireman, served in the Marines handling delicate assignments and is well regarded in the community. Mrs. Harshey has shown great courage and resourcefulness in two situations, where, as a bank teller with a gun placed at her head she reacted immediately and calmly tripped the alarm; and in the other instance, took the automobile license number of the bank robber resulting in the capture of the armed robber. The other tests are met, as well."

[2]There was no record that Judge Locher's opinion had been journalized as of the date of oral argument before this appellate court. The parties have both stipulated that the document titled "Opinion" and containing Judge Locher's signature is genuine.

In spite of this finding that the Harsheys met all the tests of adoptive parents, the trial court denied their petition for the adoption of Gary, and ordered the Harsheys placed on the Welfare Department waiting list of prospective adoptive parents "at such a position as they would now be had they been approved as adoptive parents in February of 1973."

Appellee agrees, in its brief, that the rationale for the trial court's decision is found in the portion of the court's opinion titled "The Adoption Process," which reads as follows:

"The petitioners, the Harsheys, stand in no different shoes than do those many couples now on the waiting list. The Court in deciding this case cannot ignore the love, concern and anxiety felt by these prospective parents who have been approved, for some time now, after the adoptive home-studies were made, and who have waited patiently for a child to be placed in their homes for what seems to them an eternity.

"An additional concern is the integrity of the entire program of adoption—to illustrate, if so-called baby sitting parents are permitted to adopt the child they care for, as the circumstance of this case, then a circumvention occurs of the rights of those deeply committed prospective adoptive parents who have long been on the existing, waiting list.

"The Court believes that adoptive children should not be up for grabs. Therefore, the total and complete integrity of the waiting list must be honored."

The Harsheys have assigned five errors for review on appeal:

1. "The Probate Court erred in holding that the total and complete integrity of a social agency's waiting list for adoptive couples must be honored, where no statutory basis exists for either such list or for the holding recognizing the list."

2. "The Probate Court erred in basing its decision on matters not in evidence."

3. "The Probate Court erred in failing to grant ap-

pellants' amended petition for adoption of the child Gary Elledge where the court found, in terms, that by the '\* \* \* standards of maturity, stability, financial ability and love of children, this young couple comes through with flying colors,' and that '[t]he other tests are met, as well.' "

4. "The Probate Court erred in finding that the best interests of Gary Elledge would be promoted by slavish adherence to a waiting list without regard to the child's relationship with appellants."

5. "Having found it desirable for Gary Elledge to grow up in proximity with his half-brother Freddy (called Nick in the opinion), and having found that '. . . they should be reared in such a manner as to be associated with each other from time to time . . .', the Probate Court erred in failing to grant appellants' petition for adoption, where appellants meet precisely the criteria set forth by the Court, and where testimony shows that the contacts of the appellants with Gary were highly beneficial to him."

Assignments of error numbers one through four, inclusive, are restatements of appellants' basic contention that, having found that the Harsheys met all the tests as suitable adoptive parents, the trial court erred in denying the petition for adoption where such denial was based solely upon a matter not in evidence, namely, an agency "waiting list." For the reasons stated below, we hold that these four assignments of error are well taken.

Gary Elledge was born on May 6, 1971, and he is now over four years old. He has not yet enjoyed the benefit of a permanent home with the love and guidance of a mother and father who can confidently make long range plans for his well being. There are undoubtedly many couples who are qualified, willing and able to give Gary a stable home full of parental love and care. The trial court has found that the Harsheys are such a couple. But, because the Harsheys apparently were never placed on the waiting list of the adoption department of the Cuyahoga County Welfare Department, their petition for the adoption of Gary has been denied, and Gary has been placed in yet another foster home pending the outcome of further litigation.

In its opinion, the trial court noted that, according to the adoption policies of the Cuyahoga County Welfare Department, Division of Social Services, ''The main purpose of adoption is to find homes for children, not to find children for families.'' We agree with the trial court that such a purpose is laudatory for it places the best interests of the child above the desires and needs of the adoptive parents. But, we cannot agree that the trial court's decision in this case, no matter how nobly motivated, does service either to the main purpose of adoption or to the best interests of Gary.

The court has found that the Harsheys are suitable adoptive parents, but has denied their petition for adoption because to permit the Harsheys to adopt Gary would circumvent the rights of the prospective adoptive parents who have long been on the waiting list. Thus, the trial court has done exactly what it said should not be done, that is, it has in essence placed the needs and desires of the prospective adoptive parents on the waiting list above the need to find a home for Gary.

We do not mean to imply that the use of a waiting list for applicants to adopt children in the custody of the Welfare Department is *per se* improper. In fact, the use of such a waiting list may be the only fair way to administer adoptions where there are more qualified applicants than children available for adoption. However, there was no testimony given below concerning the existence or administration of this ''waiting list.'' With the lack of testimony below, many questions remain unanswered. Why weren't the Harsheys told about the waiting list when they first petitioned to adopt Gary? The trial court ordered the Harsheys placed on the list at the same position as though they had been approved in February of 1973. Are only approved parties put on the list, or does the list contain unapproved applicants? Are we speaking of Court approval, as the Harsheys have been given, or merely agency approval? Is the waiting list on a pure first-come-first served basis, or does the administration of the list include the flexibility needed to place children with the parents best suited for the particular child in question?

Without the answers to these and other vital questions, judicial review of the agency's administration of the waiting list is impossible.

In *State, ex rel. Portage County Welfare Dept.*, v. *Summers* (1974), 38 Ohio St. 2d 144, the Supreme Court of Ohio stated, at 151:

"Matters of adoption are of such compelling public interest that any statutory incroachment upon the power of the courts to exercise the discretion granted them by statutory and constitutional provisions must be carefully scrutinized.

"The effect of R. C. 3107.06(D) is not, as appellees contend, to make those agencies enumerated therein the final arbiters in adoption proceedings when agency approval is withheld, thereby depriving the court of its statutory and constitutional authority to hear and determine adoption matters.

"We conclude that such deprivation of authority would not only be anomalous but would constitute an impermissible invasion of the Probate Court's power to act in areas in which the court is specifically vested by statute with authority to perform its judicial power granted by the Constitution. Therefore, R. C. 3107.06(D) may not operate to divest the Probate Court of its necessary judicial power to fully hear and determine an adoption proceeding. To hold otherwise would leave the fate of the adoptive child to agency whim or caprice without having the agency's reasons for denying consent adjudicated."

We believe that to uphold the denial of the Harsheys' petition to adopt Gary based upon a need to preserve the integrity of the agency waiting list when there has been no testimony concerning the existence or administration of such a list would similarly leave the fate of Gary to agency whim or caprice, not subject to judicial review.

There was no testimony below that there was an agency list of approved couples waiting to adopt Gary or a child of Gary's age. In fact, Patricia Zaccaro testified that she had not personally studied anyone for adoption of Gary or a child of Gary's age.

Further, if the Harsheys are placed on the list as of

February of 1973, as ordered by the trial court, this would give them 2½ years of seniority on the waiting list. It is difficult to believe that there are couples who have been waiting for more than 2½ years to adopt a child who is four years old. We therefore cannot agree that the granting of the Harsheys' petition to adopt Gary would violate the integrity of the entire program for adoption, and leave adoptive children "up for grabs."

In ordering the placement of Gary pending adoption, the trial court found that it would be in Gary's best interest to place him in a home which, by location, and economic situation would permit and encourage Gary and his half-brother Freddy Kocsis to grow into adolescence and manhood as brothers. It is undisputed that the Harsheys live near the home of the Kocsis' family, and that these two families, being related to one another, appear to be uniquely qualified to insure that if Gary were adopted by the Harsheys, he and Freddy would have the type of brotherly companionship found desirable by the court below. In their fifth assignment of error, appellants argue that the court erred in denying their petition for adoption because they possess all of the qualifications set up by the trial court to insure that Gary and Freddy are raised as brothers. We find that this assignment of error is also well taken.

The two basic issues to be decided by the Probate Court in an adoption hearing conducted pursuant to R. C. 3107.09 are: (1) whether the petitioners are suitably qualified to care for and rear the child; (2) whether the best interest of the child will be promoted by adoption. *State, ex rel. Portage County Welfare Department*, v. *Summers*, *supra*. The Probate Court expressed absolutely no reservations as to the suitability of the appellants as adoptive parents. We are not persuaded that it would be in the best interest of the subject child to have this cause remanded for still more litigation and resultant delay in finding him a permanent home.

This court is reluctant to make a final adoption decision, and would not do so under other than extraordinary

circumstances. However, Gary is rapidly approaching the age when psychologists tell us that the basic traits of his personality will be permanently formed. For this reason, and for the reasons set out above, the decision of the trial court is reversed, and the appellants' petition for the adoption of Gary Harshey is hereby granted. *Cf.* Appellate Rule 12(B) and (C).

*Judgment reversed.*

DAY, J., concurs.
PARRINO, J., dissents.

PARRINO, J., dissenting. Although I agree with the proposition that the main purpose of adoption is to find homes for children, not children for homes, I respectfully dissent from the majority view for the following reasons.

Based upon the record in the present case, it is my opinion that the denial of the Harsheys' petition for adoption was not based solely on maintaining the integrity of the waiting list kept by the County Welfare Department, Division of Social Services. The record indicates that the trial court conducted a thorough inquiry, as required by R. C. 3107.09, into the suitability of the petitioners as adoptive parents. Two social workers testified at that hearing and expressed their reservations as to the petitioners suitability to become Gary's adoptive parents. Miss Ann Cowan, Chief Social Worker of the Adoptive Services Department of the Cuyahoga County Welfare Department, stated that she disapproved of the Harsheys only because she felt they were unsuitable adoptive parents for *Gary*. Miss Cowan further stated, however, that she did not totally reject the Harsheys as prospective adoptive parents and that in her opinion the Harsheys would be better suited to adopt an infant rather than a two or three-year old child.

The unrebutted evidence in this case indicates that Gary was not placed in the petitioners' home by his mother or by any action of the County Welfare Department. In all probability, it was this fact which prompted the trial

court to comment that "[t]he court believes that adoptive children should not be up for grabs." It is certain that if such practices were permitted to continue, no matter how innocent or well intended, the clearly defined legislative policy of regulating adoptions through properly approved and authorized agencies would be circumvented and frustrated. R. C. 3107.01 *et seq.*

In deciding this case the trial court referred to the waiting list maintained by the Social Services Director of the County Welfare Department. Although the transcript of proceedings contains no reference to this list, it is my view that the trial court could properly take judicial notice of such waiting list without the suggestion of counsel. *Brown* v. *Piper* (1875), 91 U. S. 37; *Weaver* v. *United States* (5th Cir. 1962), 298 F. 2d 496, 498. The probate court, being vested with exclusive jurisdiction in adoption proceedings, *State, ex rel. Portage County Welfare Dept.,* v. *Summers* (1974), 38 Ohio St. 2d 144, and having intimate contact with the Department of Social Services in the conduct of such proceedings, was justified in recognizing the validity and usefulness of such a list, even though the court in making its determination as to an adoption must always do so consistent with the best interests of the child.

The trial court's finding that the Harsheys generally passed the test as adoptive parents with "flying colors" was not the singular standard applied in this case. The second and more important standard considered the best interests of the child. Upon considering all the evidence in this case, the trial court concluded that:

"It is the court's deliberate opinion that the best interest of Gary Elledge would be promoted by denying the petition for adoption. . . ."

Upon my review of the record, I am convinced that the findings of the trial court are supported by the evidence. Therefore, I would affirm the decision of the trial court.

One further point of the majority opinion requires comment. The majority has conceded that the use of a waiting list may be the only fair way to administer adop-

tions. However, even if it could be construed that the trial court was not justified in taking judicial notice of the waiting list, it is nevertheless my view that the more appropriate action would be to remand this case to the Probate Court for further proceedings on that issue without granting appellants' petition for adoption in this court. The infirmity in the action taken by the majority becomes apparent when one considers that the trier of the facts has not yet made a specific determination that such an adoption by the Harsheys would be in the best interest of this particular child.