## In re Adoption of KOHORST.

[Cite as *In re Adoption of Kohorst* (1992), 75 Ohio App.3d 813.]

Court of Appeals of Ohio,
Paulding County.

No. 11–92–1.

Decided June 17, 1992.

David A. Hyman, for appellant.
Kay Wildermuth, for appellee.

EVANS, Judge.

This is an appeal by Richard G. Kohorst from a judgment of the Court of Common Pleas of Paulding County, Probate Division, dismissing his petition for the adoption of his legitimate minor daughter, Samantha J. Kohorst.

Richard G. Kohorst ("appellant") and Tamara D. Sweany ("appellee") were married on March 28, 1987. Samantha Kohorst was the only child born of that marriage. The parties were divorced on July 18, 1990. By judgment of the Court of Common Pleas of Paulding County, appellant was granted the permanent custody and control of Samantha, subject to appellee's right of reasonable visitation. Appellee, who resided in Texas at the time of the divorce, was absent from the divorce proceeding, but was represented by counsel. The court thus further provided that as long as appellee continued to reside outside the state of Ohio, Samantha's maternal grandparents would have the privilege of visitation with her on two weekends each month. No order was entered requiring appellee to make child support payments.

On September 11, 1991, appellant filed a "Petition for Adoption of Minor Child" in the probate division of the court of common pleas, pursuant to R.C. Chapter 3107. Appellant alleged in the petition that appellee's consent to the adoption was not required due to her failure, "without justifiable cause, to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding the filing of the adoption petition." See R.C. 3107.06(A); R.C. 3107.07(A) (providing that failure to support may in some circumstances constitute waiver of the consent requirement of R.C. 3107.06[A]). The petition further provided that it was appellant's "desire * * * to establish the relationship of parent and child [between himself and Samantha]." Appellant requested no name change for the child since she already bears his name.

On October 18, 1991, a hearing was held on appellant's petition and on appellee's motion requesting dismissal of the petition. Appellee, although not present at the hearing, was represented by counsel. Since the probate judge recused himself from hearing the case, Judge David Webb presided over the hearing by assignment. The record herein reveals that prior to the examination of witnesses, counsel for both parties stipulated to three relevant facts: first, that the Paulding County Probate Court judge had previously allowed a biological parent to petition for the adoption of his or her own natural, legitimate child, solely for the purpose of permanently terminating the other parent's rights and responsibilities regarding that child; second, that appellee had contributed to Samantha's support in the year preceding the adoption only to the extent of two Christmas gifts and an article of clothing; and third, that

appellee had never been ordered by the court to contribute to Samantha's support.

Following the examination of appellant and his mother, who were the only witnesses, the judge requested memoranda on the issues presented at the hearing, particularly that of whether the petition was permitted under the Ohio adoption statute. On December 9, 1991, the court granted appellee's motion for dismissal, finding that it was "without jurisdiction to grant the relief sought in the petition."

Appellant appealed the court's judgment, asserting two assignments of error:

"I. In its journal entry filed on December 9, 1991, the judge by assignment of the Paulding County Probate Court erred as a matter of law, to the substantial prejudice of Appellant, by dismissing Appellant's petition for adoption of his minor daughter, Samantha J. Kohorst, by failing to follow that court's policy that it does have jurisdiction to permit adoptions by a natural parent of the natural parent's own child.

"II. In its journal entry filed on December 9, 1991, the judge by assignment of the Paulding County Probate Court erred as a matter of law, to the substantial prejudice of Appellant, by dismissing Appellant's petition for adoption of his minor daughter, Samantha J. Kohorst, based upon the court's erroneous finding that a natural parent cannot adopt his own child in Ohio and thus terminate all rights, responsibilities, and relationships that the other natural parent might have with reference to the child."

I

■ Appellant first complains that the judge assigned to this case should be required to follow the "pertinent written policy statements of the Judge who he has replaced [sic]," since the judge who devised the policy would surely have followed it. Although we agree that a judge properly chosen as a substitute may and should exercise the "rights, powers, and duties" generally assumed by the regular judge, appellant's conclusion that the judge herein was therefore required to "step[ ] into the shoes of the disqualified judge," implying that the substitute must also assume the disqualified judge's mindset, is erroneous.

It is a trial-level judge's duty under Canon 3 of the Code of Judicial Conduct to hear a case, determine the state of the law which applies to the facts, and apply the law to the case before him, unswayed by any "partisan interests or fear of criticism." Further, we conclude that a judge is unconstrained by any requirement to follow a "policy" which he believes contravenes the law. Until a reviewing court has heard and ruled on the validity of such "policy" or

"position," it remains that of its author only, and is not binding on another judge, even in the same court. Therefore, we find no error in the failure of the assigned judge to "follow" the probate court judge's policy; indeed, the situation herein scarcely differs from situations at the trial court level wherein parties may encounter more than one tenable judicial position, depending upon which regular judge hears a case. The first assignment of error is not well taken.

## II

Appellant's admitted sole purpose in filing the adoption petition was to terminate any parental rights and responsibilities retained by appellee, his daughter's natural mother, since he feels that Samantha may at some time be adversely affected by her mother's lifestyle. Appellant has presented several arguments in support of his use of the adoption proceeding to accomplish a result which is not otherwise provided for under Ohio law, *i.e.*, an action on the part of an individual, taken *solely* for the purpose of permanently divesting another of all natural parental rights.[1]

The cornerstone of the adoption statutes is the promotion of children's welfare, specifically those children who lack and are in need of the security and benefits of a loving home and family. As stated by one Ohio court, "[t]he main purpose of adoption is to find homes for children, not to find children for families." *In re Harshey* (1975), 45 Ohio App.2d 97, 102, 74 O.O.2d 120, 123, 341 N.E.2d 616, 619.

Since there was no such legal proceeding under the common law, adoption is a statutory creation, allowed only under circumstances specifically intended by the legislative enactment. Appellant presents the argument that Ohio's adoption statute, on its face, would allow him to petition for the adoption of his own, natural, legitimate child, if the other natural parent has consented (under R.C. 3107.06), or such consent is not required (under R.C. 3107.07).

Appellant relies on the following statutory provisions:

R.C. 3107.02 (who may be adopted).

"(A) Any minor may be adopted. * * * "

R.C. 3107.03 (who may adopt).

"The following persons may adopt:

" * * *

---

1. Some states provide for actions of this type, under certain conditions. See, *e.g.*, 10 Okla.Stat. 1130 (1971).

"(B) An unmarried adult;

"(C) The unmarried minor parent of the person to be adopted * * *."

For the reasons set forth below, after a thorough analysis of the statutory scheme as a whole, and of the available commentary and statutory history of the Adoption Act, we disagree with appellant's assertions.

 It is axiomatic that the intent of the legislature in enacting a statute should be determined when courts are faced with statutes susceptible of more than one interpretation. In construing such a statute, courts have historically resorted to one or several of the following considerations: (1) circumstances surrounding the legislative enactment; (2) underlying history of the statute, *e.g.*, the relevant common law or former statutory provisions; (3) the spirit of the statute, or, the ultimate results intended by adherence to the statutory scheme; (4) the public policy which induced the statute's enactment; (5) the "mischief" sought to be avoided by enactment of the statute; (6) the statute's internal titles, preambles, and captions; (7) construction by other courts and agencies; and (8) the general "scheme" of the statutory enactment, including explanations by foreign courts and commentators when interpreting their own and others' enactments, including "uniform laws." See, generally, 85 Ohio Jurisprudence 3d (1988) 162–240, Interpretation and Construction of Statutes, Sections 171 through 231.

 Back in the days when a child "born out of wedlock" was stigmatized by illegitimate status, the adoption statutes provided a legal vehicle by which such child could become part of a family, thus obtaining all the rights accorded those who were born "legitimate." As stated by the Supreme Court of Ohio: ·

"For all purposes under the laws of this state, including without limitation all laws and wills governing inheritance of and succession to real or personal property and the taxation of such inheritance and succession, a legally adopted child shall have the same status and rights, and shall bear the same legal relationship to the adopting parents as if born to them in lawful wedlock and not born to the natural parents * * *." *In re Adoption of Biddle* (1958), 168 Ohio St. 209, 214, 6 O.O.2d 4, 7, 152 N.E.2d 105, 109. Adoption thus creates a legal family relationship between persons who are not so related by nature or law [2]; it accords no benefits, rights, obligations, or duties which did not exist as the result of the natural relationship. Except in the case of illegitimacy, where the natural relationship of parent and child exists, there is

---

2. There is even a new birth record issued after an adoption, naming only the adoptive parents, *i.e.,* the new "legal" parents.

no need for a legally created relationship. See, *e.g., Leake v. Grissom* (Okla.1980), 614 P.2d 1107, 1109; *Gilbertson v. Gilbertson* (Okla.1972), 498 P.2d 1381, 1384 (proceeding wherein natural father, after divorce, adopted his natural, legitimate child in order to frustrate divorce court's award of custody to mother, was void) (citing with approval and following *Marshall v. Marshall* [1925], 196 Cal. 761, 239 P. 36, 38); *Petition of Curran* (1943), 314 Mass. 91, 49 N.E.2d 432 (such action allowed for purpose of legitimizing child born out of wedlock); *Bridges v. Nicely* (1985), 304 Md. 1, 497 A.2d 142 (petition of natural father of child born out of wedlock allowed where paternity statute was unclear as to whether all rights of legitimacy inured to child legitimized under the statute); *McDonald v. Hester* (1967), 115 Ga.App. 740, 155 S.E.2d 720 (adoption allowed for purpose of rebutting presumption that new husband was not natural father).

In more recent years, along with societal changes in attitude and the United States Supreme Court's rulings against discriminatory action taken against minorities, including illegitimate children, the Ohio legislature has provided procedures for the express purpose of legitimization of children. R.C. Chapter 3111, the Parentage Act (first effective as of June 1982), made obsolete the common-law action in "bastardy" which provided a means of establishing the identity of the father of an illegitimate child.

Under the common law in Ohio, a bastardy action was permitted only by or against a presumed father who had reached the age of majority. *State ex rel. Love v. Jones* (1953), 98 Ohio App. 45, 57 O.O. 161, 128 N.E.2d 228 (action or proceeding under the Bastardy Act may not be instituted or prosecuted by a minor). Such was the law in effect when the Ohio legislature enacted the Adoption Act in 1977 (modeled partly after the Uniform Adoption Act). Thus, prior to the Adoption Act, there was no recourse under the law for a minor father or mother to establish paternity for a child born out of wedlock. Appellant contends that the provisions of the Adoption Act providing that "an unmarried adult" or "the minor parent of the person to be adopted," read *in pari materia,* must be read as allowing appellant, an "unmarried" *adult* "parent of the person to be adopted" to file this action. However, we find that, since the Adoption Act was enacted several years before the Parentage Act which facilitated legitimization of children and establishment of the parent/child relationship, the legislature most likely intended those provisions of the Adoption Act to "cure the mischief" created by the deficient laws in effect at the time.

Nearly anyone with an interest may file an action under the parentage statute, to determine the father/child relationship. R.C. 3111.04. Furthermore, the statute itself now provides rebuttable (by clear and convincing

evidence) presumptions of fatherhood, and thus legitimacy under several given circumstances other than marriage. R.C. 3111.01(B); R.C. 3111.03. See *Santosky v. Kramer* (1982), 455 U.S. 745, 764–769, 102 S.Ct. 1388, 1400–1403, 71 L.Ed.2d 599, 613–617 (establishment and/or termination of natural parental rights must be supported by proof which is clear and convincing). We therefore do not believe that the General Assembly intended for adoption proceedings to be available for the "adoption" of one's own natural child, born in wedlock, since the only possible purpose of bringing such action could be to terminate the other parent's natural parental rights.

■ Furthermore, it would seem a harsh consequence to permanently and completely terminate Samantha's rights as to her mother and her mother's natural family solely because appellant fears that appellee's lifestyle may in the future have adverse effects on the child. At the present time, appellee resides so far away that visitation on a regular basis is not feasible; thus, we are left to imagine exactly what influence could be exercised by appellee which would harm Samantha. The great distance separating the parties further appears to have been the basis for the divorce court's grant of visitation rights to appellee's parents, so as to provide some regular contact for Samantha with her grandparents and half-sisters. Appellant's action of filing an adoption petition to terminate appellee's parental rights would thus seem to be overkill. If, in fact, appellant finds the present visitation arrangement harmful to Samantha, Ohio provides the means of terminating or modifying visitation rights by the less-drastic filing of a motion in the original divorce action, or in the juvenile court. See R.C. 3109.051; R.C. 3109.06; R.C. 3109.04(B) and (C). Otherwise, Ohio law does not make provision for an individual to terminate another's parental rights. A child must first be found by the juvenile court to be abused, neglected, or dependent, in order for the state to assume permanent custody of the child and thereby terminate the parents' rights. Even then, it must be proven by clear and convincing evidence that there is no viable alternative which would guarantee that the child at issue is properly supported and cared for, for parental rights to be permanently terminated. Samantha's father (appellant) presently provides a loving and comfortable home for her. If that circumstance should ever change, only then would the state intervene on Samantha's behalf. See R.C. Chapter 2151.

■ Appellant argues that because Samantha's natural mother had paid no child support for her since the parties' divorce in 1990, that "[a]n adoption by the natural father terminating the natural mother's support obligations and visitation rights would not deprive the child of anything." However, appellant seems to ignore the fact that adoption "embraces not only custody and

support but also descent and inheritance and in fact every legal right with respect to the child." *In re Adoption of Biddle, supra*, 168 Ohio St. at 214, 6 O.O.2d at 7, 152 N.E.2d at 109. Therefore, as appellee argued, termination of the legal relationship between Samantha and her mother would also eradicate any rights Samantha would have in the future such as inheritance from or through her mother, receipt of government benefits of any kind through her mother, or any rights to legal actions arising out of her legal relationship to her mother, such as an action for wrongful death. Thus, despite the fact that appellee was not ordered to pay child support on Samantha's behalf, Samantha has a right to care and support from her mother should her father die or be injured and unable to care for her. See *Brooks v. Fair* (1988), 40 Ohio App.3d 202, 532 N.E.2d 208 (elimination of other parent's duty of support increases the chance that the state would have to assume that duty if custodial parent became unable to support the child). See, also, *In re Adoption of Graham* (1980), 63 Ohio Misc. 22, 17 O.O.3d 341, 409 N.E.2d 1067 (parental duty of support owed to child is also a duty owed to the state).

Further in consideration of Samantha's legal rights, although appellee lives in Texas, and thus sees Samantha only occasionally, the divorce court, presumably after consideration of the child's best interests, specifically granted visitation rights to Samantha's maternal grandparents. Samantha therefore maintains a regular relationship with her grandparents and her half-sisters, on a semi-monthly basis. It appears that, under the Ohio adoption statute, the child's relationship between herself and her natural maternal grandparents, and with her sisters, would be terminated once adoption had taken place. R.C. 3107.15(A)(1) (adoption acts to "terminate all legal relationships between the adopted person and his relatives"); *In re Adoption of Ridenour* (1991), 61 Ohio St.3d 319, 325, 574 N.E.2d 1055, 1060.

This is not a situation analogous to stepparent adoption, wherein a stepparent adopts his stepchild with permission of both natural parents, without divesting the stepparent's natural-parent partner of her parental rights. See R.C. 3107.15(A)(1). Nor is it like adoption of a child whose parents' rights have been terminated due to neglect or dependent status of the child. In those situations the child is not deprived of any rights or parental obligations, but, rather, the child is acquiring all the rights of which he or she was previously deprived. Therefore, the goals of the adoption laws are fulfilled, and a new legal family relationship is created which before did not exist, "for all purposes including inheritance and applicability of statutes, documents, and instruments * * *." R.C. 3107.15. The adopted child then has, in the ideal adoptive situation, two legal, dependable parents where he previously had none, or only one (as in the stepparent situation), or, at least one new parent, whereas he before had none. See *In re Adoption of Charles B* (1990),

50 Ohio St.3d 88, 552 N.E.2d 884 (adoption of handicapped child by single adult permitted where child was in permanent custody of human services department, and court determined that one loving parent was better than none at all).

Based on the foregoing analysis of the statutory adoption scheme, we conclude that the law and public policy of Ohio would preclude the adoption of one's own, legitimately born, natural child for the sole purpose of terminating the other natural parent's rights. Appellant's second assignment of error is therefore overruled.

Having found no prejudice to appellant herein in any of the particulars assigned and argued, we affirm the judgment of the probate court dismissing the adoption petition.

*Judgment affirmed.*

HADLEY, P.J., and THOMAS F. BRYANT, J., concur.