This is an appeal from a Lawrence County Common Pleas Court, Probate Division, judgment granting the petitions for adoption filed by Joseph and Judith Conroy, petitioners below and appellees herein, over the objection of Susan Riley Conroy, respondent below and appellant herein.
Appellant raises the following assignments of error for review:
FIRST ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN FAILING TO DISMISS THIS CASE BASED UPON THE PAULDING COUNTY COURT OF APPEALS DECISION, IN RE: KOHORST (1992) 75 O APP 3D 813 [SIC]."
SECOND ASSIGNMENT OF ERROR:
 "PETITIONER/APPELLEES FAILED TO MEET THE BURDEN OF PROOF OF CLEAR AND CONVINCING EVIDENCE OR EVIDENCE SUFFICIENT TO EXTINGUISH PARENTS FUNDAMENTAL LIBERTY INTEREST IN CARE, CUSTODY, AND MANAGEMENT OF THEIR CHILDREN [SIC]."
THIRD ASSIGNMENT OF ERROR:
 "THE RULING OF THE COURT, GRANTING FINAL DECREE OF ADOPTION, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE [SIC]."
Our review of the record reveals the following facts pertinent to the instant appeal. Appellant and Eric Conroy were married on May 1, 1993. Three children were born during the marriage: Jessica, date of birth September 20, 1991; Maggie, date of birth February 28, 1994; and Chelsie, date of birth April 1, 1996.
In 1995, after the birth of Jessica and Maggie, appellant and Eric decided to travel to the State of Washington in search of employment. Appellant and Eric agreed to leave Jessica and Maggie with Eric's parents, Joe and Judy Conroy.
Appellant and Eric experienced problems in their relationship while in Washington. Eric eventually left appellant, and appellant began a relationship with Josh Clark, a man whom she and Eric had befriended while in Washington. Approximately six months after appellant and Clark had traveled to Washington, Clark and appellant returned to Ohio. When Eric returned to Ohio, he filed for divorce.
Jessica and Maggie continued to live with the Conroys, while Clark and appellant cohabitated along with appellant and Eric's youngest child, Chelsie. Appellant continued to visit with Jessica and Maggie.
In October 1996, allegations arose that Clark had physically and sexually abused Jessica and Maggie. Children Services investigated the allegations and concluded that while the physical abuse allegations could be substantiated, the sexual abuse allegations could not be substantiated. Nonetheless, the allegations caused strain in appellant's relationship with Clark. Thus, in November of 1996, appellant and Clark ended their relationship. Clark moved out of the residence and, in March of 1997, left the area.
On May 30, 1997, Eric and appellant were divorced. In their divorce decree, Eric and appellant relinquished their right to custody of Jessica and Maggie and allowed the children's paternal grandparents, appellees, to be named as Jessica and Maggie's residential parents and legal guardians. The divorce decree gave appellant custody of Chelsie and required appellant, an unemployed, full-time college student who receives ADC benefits, to pay $50 per month in child support for Jessica and Maggie.
The divorce decree also gave appellant a right of visitation with Jessica and Maggie. The court appointed Peggy O'Brien, a licensed social worker, to draft the visitation plan. O'Brien's plan permitted appellant to visit with her children once a week for one-half hour provided that: (1) the visitation occur under the supervision of Peggy O'Brien or other pre-approved social worker; (2) twice per month, appellant complete urine screens to assess drug use; (3) appellant complete an assessment and undergo counseling at Family Services in Huntington, West Virginia; (4) appellant complete parenting classes; (5) appellant contact Peggy O'Brien seven days in advance to schedule visitation; and (5) appellant pay Peggy O'Brien or other pre-approved social worker $60 per hour.
Appellant found O'Brien's plan to impose an unreasonable burden on her right of visitation. Appellant was unable financially to comply with all of the conditions imposed in O'Brien's plan. Appellant did not, however, seek to have the plan modified. Thus, appellant did not exercise her visitation rights with her children. Prior to the filing of the adoption petitions, December 24, 1996, was the last time appellant visited with Jessica and Maggie.
On January 6, 1998, appellees filed petitions for the adoption of Jessica and Maggie. In their petitions, appellees asserted that pursuant to R.C. 3107.07(A), appellant's consent to the adoption was not required. The Conroys claimed that appellant, without justifiable cause, failed to communicate with or to support her minor children in excess of one year. On January 6, 1998, Eric Conroy, Jessica and Maggie's natural father, entered his consent to the adoptions. On February 11, 1998, appellant entered her objection to the adoption petitions.
On April 9, 1998, the trial court held a hearing regarding whether appellant's consent to the adoptions was required. The Conroys argued that clear and convincing evidence existed to demonstrate that appellant's consent was not required. The Conroys noted that R.C. 3107.07(A) provides that a parent's consent to adoption is not required when the court finds that:
 [the] parent of [the] minor * * * has failed without justifiable cause to communicate with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.
The Conroys noted that appellant admitted that she had failed to provide maintenance or support in the one year period immediately preceding the filing of the adoption petitions. The Conroys asserted that no evidence existed to justify appellant's failure to provide maintenance or support. Furthermore, appellees argued that appellant failed without justifiable cause to communicate with Jessica and Maggie during the one year period immediately preceding the filing of the adoption petitions. The Conroys contended that appellant's only alleged efforts at communication during the one year immediately preceding the adoption petition was sending three cards to Jessica and Maggie. Judy Conroy testified at the hearing, however, that she never received cards for either Jessica or Maggie.
Appellant argued that her consent to the adoption petitions was required because the evidence demonstrated that she possessed justifiable cause for failing to provide maintenance or support for Jessica and Maggie during the one year period immediately preceding the filing of the adoption petitions. First, appellant noted that the divorce decree establishing her support obligations was not entered until May of 1997. Thus, appellant argued that she had no support obligations to her children until May of 1997, and that she therefore did not fail to provide maintenance or support during the one year period immediately preceding the January 6, 1998 filing of the adoption petitions. Second, appellant asserted that her former husband, Eric, was supposed to provide her with money to fulfill her support obligations to Jessica and Maggie. Appellant claimed that Eric had failed to provide her with any money, and, consequently, she could not fulfill her support obligations to Jessica and Maggie.
Appellant further asserted that justifiable cause existed to excuse her failure to communicate with Jessica and Maggie during the one year period immediately preceding the filing of the adoption petitions. Appellant argued that Peggy O'Brien's visitation plan imposed unreasonable conditions upon appellant's right of visitation. Appellant claimed that she did not possess the financial resources to fulfill all of the conditions that the visitation plan imposed. Appellant stated that as an unemployed, full-time college student, she could not afford to pay $60 per hour for a social worker to supervise the visits or to pay for the drug screening and counseling. Appellant admitted, however, that she did not attempt to modify the visitation plan. Appellant explained that she was distraught about the conditions that the plan imposed and that several months elapsed before she could bring herself to think about how she could comply with the plan. Appellant further claimed that in March of 1997, she attempted to telephone the girls. Eric was visiting his parents at the time and he answered the phone when appellant called. Appellant stated that Eric informed her that Judy would not let appellant talk to the girls. Judy, however, denied informing appellant that she was not allowed to speak with the girls on the telephone.
On April 27, 1998, the trial court found that appellant's consent was not required because she failed without justifiable cause to provide for the maintenance and support of her children and to communicate with her children for a period of one year immediately preceding the filing of the adoption petitions.
On May 19, 1998, the trial court entered findings of fact and conclusions of law in accordance with its April 27, 1998 entry finding that appellant's consent was not required. The trial court found that: (1) appellant's last request for visitation with Jessica and Maggie occurred on December 24, 1996; (2) after December 24, 1996, appellant did not visit with the children or seek to modify the visitation plan; (3) appellant made no request for visitation after May 30, 1997; (4) appellant did not communicate with the children after May 30, 1997; (5) appellant did not attempt to contact anyone concerning her problems with the visitation plan; (6) appellant "made no effort to communicate in any fashion with the two girls during the one year prior to the filing of the adoption petition but for the alleged mailing of three cards and a telephone call to the grandparents' home on one occasion when she knew Eric Conroy was in town and in that call talked only to Eric Conroy"; (7) appellant had funds available during the one year period prior to the adoption petition in the amount of $300 every two and one-half months after payment of tuition and books; $1,500 every two and one-half months from school loans; $209 every month from ADC; (8) appellant paid no child support, sent no money, purchased no gifts, provided nothing of value to her children during the one year prior to the filing of the adoption petitions; (9) appellant spent no money for urine screens or counseling as set forth in visitation plan during one year preceding adoption petition; (10) appellant spent $30 to $40 each month to purchase cigarettes; and (11) appellees did nothing to prevent or discourage appellant from communicating, supporting, or providing maintenance for her children.
On May 26, 1998, the trial court appointed David Reid Dillon as the guardian ad litem for Jessica and Maggie. On June 23, 1998 and continuing on August 11, 1998, the trial court held a hearing regarding whether adoption would be in the children's best interests.
At the hearing, appellees presented testimony from friends and other members of the community who testified that appellees provided Jessica and Maggie with a loving home and that appellees were actively involved in the children's extracurricular activities. The Conroys also presented evidence tending to demonstrate that appellant's visits with her children were having an adverse effect upon the children.
Mary Michael Haney, Jessica's kindergarten teacher during the 1996-1997 school year, testified concerning Jessica's behavior in school. Haney testified that Jessica performed satisfactory work when school first began, but that in October of 1996, Haney noticed adverse changes in Jessica's performance and behavior. Haney stated that around February of 1997, Jessica's performance and behavior improved.
Dr. Joseph Carver, a clinical psychologist, testified that in February of 1997, Judy Conroy brought Jessica and Maggie to his office. Dr. Carver learned of the sexual abuse allegations and believed that the children, Jessica in particular, were suffering from a type of post-traumatic stress disorder.
Dr. Carver stated that he met with the children again in April of 1997. Dr. Carver stated that during his sessions with Jessica, anytime he referred to the sexual abuse allegations, Jessica became anxious and fearful. To help treat Jessica, Dr. Carver recommended to Judy that she constantly assure the children that no further sexual abuse will occur and that the children will remain in a safe and protected environment.
In May of 1997, Judy brought the children to see Dr. Carver again. Judy informed the doctor that appellant had been granted visitation rights and that the children appeared anxious and frightened about the prospect of resuming visitation with their mother. Dr. Carver reported that Jessica could not sleep by herself and that she was afraid of the dark. Jessica told Dr. Carver that she was frightened to resume visitation with her mother because she was afraid that the alleged perpetrator of the sexual abuse would be with her.
Dr. Carver saw the children again after their visitation with their mother. Dr. Carver testified that Jessica "had a lot of distress [and] had asked Judy and Joe if they could provide a security guard for the house." Dr. Carver concluded that the girls were exhibiting outward signs of stress as a result of the resumed visitation with appellant. Dr. Carver testified that he believed allowing appellees to adopt the children would serve the children's best interests. He stated that appellees provided the parental stability needed to nurture the children.
Appellant presented evidence attempting to demonstrate that the adoption would not be in the children's best interests. Appellant contended that granting the adoption would effectively terminate her parental right of visitation. Appellant argued that the children's best interests would be served by allowing them to continue to see their mother.
Dr. John H. Mason, a psychologist who has testified in approximately eighty custody cases, testified that appellant contacted him following the filing of the adoption petitions. Appellant requested Dr. Mason to examine her and the information pertaining to the children, and to express an opinion as to whether the adoption would be in the children's best interests. Dr. Mason testified that he administered standard personality tests to appellant and concluded that appellant exhibited no signs of abnormality. Dr. Mason further stated that he believed that the children's best interests would be served if they continued to have visitation with appellant. Dr. Mason explained that "anything that will enhance relationships between siblings and parents is in the best interest of the child."
On August 14, 1998, the guardian ad litem filed his report recommending that adoption would not be in the children's best interest. The guardian's report recited, inter alia that: (1) since Jessica's and Maggie's births, appellees, almost exclusively, have taken care of the children; (2) when appellant returned from her trip to Washington, she attempted to reassume custody of her children; (3) appellant attempted to reestablish communication with the children and visited with the children prior to the sexual abuse allegations; and (4) Peggy O'Brien's visitation plan was "clearly impracticable given [appellant's] status as a single mother attending college." The guardian further stated in his report that Jessica had expressed her desire to be adopted. Jessica stated that she wished to be adopted so she would be "safe." The guardian noted that both Jessica and Maggie stated, however, that they still would like to see their mother and their younger sister, Chelsie. While the guardian ad litem recognized in his report that "Judy and Joe Conroy are and would remain for the foreseeable future superior caretakers of Jessica and Maggie Conroy," the guardian did not believe that granting the adoption petitions would be in the children's best interests. The guardian's report stated that: "[t]he granting of the adoption petition would in effect remove the mother from the children's life."
On October 14, 1998, the court entered judgment granting the adoption petitions. On October 30, 1998, the court entered findings of fact and conclusions of law in accordance with its October 14, 1998 entry. The trial court found:
 "That the Petitioners, Joseph and Judith Conroy, have been very loving and nurturing caregivers for the two minor children during the great majority of the children's lives, being actively involved in Jessica's education * * * as well as Maggie's education * * *.
 That the Petitioners * * * have been actively involved in the children's extracurricular activities, including regular church attendance and sporting events.
 That the Petitioners * * * have provided excellent medical care for the children * * *.
 That on the other hand, the natural mother has through her actions little to no interest in the minor children through much of their lifetime, making almost no effort to communicate with[,] support[,] or have a relationship with the children until after the filing of the adoption petition herein.
 The Court further finds that the natural mother, other than her one hour weekly supervised visits, which commenced after the filing of the adoption petition, made no other effort to be involved with the children in their school or extracurricular activities.
 That from the testimony of the children's psychologist, Dr. Carver, visitations with the natural mother were having an adverse psychological effect on the children.
 That the children have a very close and loving relationship in the home of the Petitioners * * *.
 That the Petitioners * * * have shown an extreme interest, and affection for the two children throughout the children's lifetimes
 That the natural father of the children executed a consent to the adoption in open court.
 That the Petitioners have and will continue to provide a stable and suitable environment for the children."
Thus, the trial court concluded that it would be in the best interests of the children to grant the adoption petitions.
Appellant filed a timely notice of appeal.
 I
In her first assignment of error, appellant argues that the trial court should have dismissed the adoption petitions. Relying upon In re Kohorst (1992), 75 Ohio App.3d 813,600 N.E.2d 843, appellant asserts that appellees improperly used the adoption procedure as a vehicle for terminating her parental rights. Appellant maintains that prior to terminating a parent's rights with respect to the parent's natural child, a court must first adjudicate the child to be neglected, abused, or dependent in accordance with Chapter 2151 of the Revised Code. We believe that appellant's reliance upon Kohorst is misplaced.
In Ohio, Chapter 3107 of the Revised Code governs adoptions. R.C. 3107.14(C) provides that a court of competent jurisdiction may grant a final decree of adoption if the court determines that the child's best interests would be served by granting the adoption.
R.C. 3107.15(A) sets forth the effects of a final decree of adoption:
 A final decree of adoption * * * shall have the following effects:
 (1) [T]o relieve the biological or other legal parents of the adopted person of all parental rights and responsibilities, and to terminate all legal relationships between the adopted person and the adopted person's relatives * * * so that the adopted person thereafter is a stranger to the adopted person's former relatives for all purposes * * *;
 (2) To create the relationship of parent and child between petitioner and the adopted person, as if the adopted person were a legitimate blood descendant of the petitioner * * *.
Nowhere in R.C. 3107.14(C), in R.C. 3107.15(A), or in the other provisions of the Revised Code governing adoption proceedings do we find a requirement that the court first must find the child to be abused, neglected, or dependent prior to granting a final decree of adoption, thereby terminating a natural parent's right. Rather, the concept that a court first must find that a child is abused, neglected, or dependent prior to terminating parental rights is found in Chapter 2151 of the Revised Code.
Furthermore, we do not believe that the Kohorst decision compels us to reach a different conclusion. In Kohorst, the natural father of a child filed a petition to adopt his biological child. The father admittedly sought the adoption for the sole purpose of terminating the natural mother's parental rights. The father explained that he believed that the mother's lifestyle was harmful to the child. The Kohorst court concluded that the adoption procedure did not encompass the situation presented. The court stated: "[T]he law and public policy of Ohio would preclude the adoption of one's own, legitimately born, natural child for the sole purpose of terminating the other natural parent's rights." Kohorst, 75 Ohio App.3d at 822,600 N.E.2d at 849.
In the case at bar, the parties agree that neither of the appellees is the natural parent of the children. Thus, appellees are not seeking to adopt their own natural child. We therefore find the Kohorst holding inapplicable to the case subjudice.
Moreover, we disagree with appellant's argument that theKohorst decision extends to a situation in which the child's natural paternal grandparents seek to adopt the biological grandchild. The Kohorst court did not conclude that the adoption statutes prohibit a grandparent from adopting his or her grandchild. Rather, the Kohorst court limited its holding to preclude adoption by a natural parent for the sole purpose of terminating the other natural parent's rights.
Appellant nevertheless asserts that the Kohorst holding applies because appellees admitted that the primary purpose for filing the adoption petitions was to terminate appellant's parental rights. We do not believe that the Kohorst court intended its decision to apply to all adoption petitions filed for the sole purpose of terminating a natural parent's rights.
In an adoption proceeding, the focus in not upon whether the natural parent should retain any rights, but upon whether the adoption is in the child's best interest. In re Charles B.
(1990), 50 Ohio St.3d 88, 90, 552 N.E.2d 884, 886. While adoption has the effect of terminating a natural parent's rights, see R.C. 3107.15(A)(1), such is not the purpose of an adoption. The primary purpose of an adoption proceeding is to find a child a stable and loving home. See Kohorst, 75 Ohio App. 3
d at 817, 600 N.E.2d at 846 ("The cornerstone of the adoption statutes is the promotion of children's welfare, specifically those children who lack and are in need of the security and benefits of a loving home and family."); In reHarshey (1975), 45 Ohio App.2d 97, 102, 341 N.E.2d 616, 619
(stating that "[t]he main purpose of adoption is to find homes for children"). Thus, we conclude that appellees' pursuit of adopting their grandchildren does not violate Ohio law and public policy.
Accordingly, we find no error with the trial court's decision to overrule appellant's motion to dismiss the adoption petitions. Thus, based upon the foregoing reasons, we overrule appellant's first assignment of error.
 II
Appellant's second and third assignments of error are interrelated and we will, therefore, address them together.
In her second assignment of error, appellant asserts that the trial court erred by determining that appellees presented sufficient clear and convincing evidence to extinguish appellant's parental rights. In her third assignment of error, appellant contends that the trial court's decision that the adoptions would be in the best interests of the children is against the manifest weight of the evidence.
Initially, we note that appellant's second assignment of error mischaracterizes the burden of proof applicable to adoption proceedings. Appellant's second assignment of error presupposes that an adoption proceeding is, in effect, a proceeding to terminate parental rights pursuant to a Chapter 2151 abuse, neglect, or dependency proceeding in which the clear and convincing evidence standard generally applies. A petitioner seeking to adopt a child, however, need not demonstrate, by clear and convincing evidence,[1] that the adoption would be in the child's best interests. Rather, the trial court has discretion to decide whether adoption would be in the child's best interest. See, e.g., Charles B., 50 Ohio St. 3
d at 94, 552 N.E.2d at 889.
In determining whether to grant or deny an adoption, a trial court must consider " ' (1) whether the petitioner is suitably qualified to care for and rear the child, and (2) whether the best interests of the child will be promoted by the adoption.' " In re Ridenour (1991), 61 Ohio St.3d 319, 320,574 N.E.2d 1055, 1057 (quoting State ex rel. Portage Cty. Welfare Dept. v.Summers (1974), 38 Ohio St.2d 144, 311 N.E.2d 6, paragraph four of the syllabus); see, also, Charles B., 50 Ohio St.3d at 93,552 N.E.2d at 889. The trial court's primary consideration, however, is the best interests of the child. Charles B.,50 Ohio St. 3d at 90, 552 N.E.2d at 886 (stating that "[t]he polestar by which courts in Ohio * * * have been guided is the best interest of the child to be adopted").
R.C. 3107.161(B) sets forth the factors a trial court should consider when determining whether an adoption is in the best interest of a child. The statute provides:
 When a court makes a determination in a contested adoption concerning the best interest of a child, the court shall consider all relevant factors including, but not limited to, all of the following:
 (1) The least detrimental available alternative for safeguarding the child's growth and development;
 (2) The age and health of the child at the time the best interest determination is made and, if applicable, at the time the child was removed from the home;
 (3) The wishes of the child in any case in which the child's age and maturity makes this feasible;
 (4) The duration of the separation of the child from a parent;
 (5) Whether the child will be able to enter into a more stable and permanent family relationship, taking into account the conditions of the child's current placement, the likelihood of future placements, and the results of prior placements;
 (6) The likelihood of safe reunification with a parent within a reasonable period of time;
 (7) The importance of providing permanency, stability, and continuity of relationships for the child;
 (8) The child's interaction and interrelationship with the child's parents, siblings and any other person who may significantly affect the child's best interest;
 (9) The child's adjustment to the child's current home, school, and community;
 (10) The mental and physical health of all persons involved in the situation;
 (11) Whether any person involved in the situation has been convicted of, pleaded guilty to, or accused of any criminal offense involving any act that resulted in a child being abused or neglected; whether the person, in a case in which a child has been adjudicated to be an abused or neglected child, has been determined to be the perpetrator of abusive or neglectful act that is the basis of the adjudication; whether the person has been convicted of, pleaded guilty to, or accused of a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the person's family or household; and whether the person has been convicted of, pleaded guilty to, or accused of any offense involving a victim who at the time of the commission of the offense was a member of the person's family or household and caused physical harm to the victim in the commission of the offense.
Moreover, pursuant to R. C. 3107.161 (C),[2] the individual opposing the adoption carries the burden of producing evidence relating to the child's best interests.
The trial court enjoys considerable discretion in determining whether an adoption is in the best interest of the child. See R.C. 3107.14(C); Charles B., 50 Ohio St.3d at 94,552 N.E.2d at 889. Accordingly, absent an abuse of discretion, a reviewing court may not reverse a trial court's decision. An abuse of discretion implies more than an error of law or of judgment. Rather, an abuse of discretion suggests that the trial court acted in an unreasonable, arbitrary, or unconscionable manner.In re Jane Doe 1 (1991), 57 Ohio St.3d 135, 566 N.E.2d 1181;Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,450 N.E.2d 1140. Furthermore, an appellate court should not substitute its judgment for that of the trial court when competent, credible evidence supports the trial court's decision. In re Adoption ofDeems (1993), 91 Ohio App.3d 552, 558, 632 N.E.2d 1347, 1350;Trickey v. Trickey (1952), 158 Ohio St. 9, 13, 106 N.E.2d 772,774. As the court stated in Miller v. Miller (1988), 37 Ohio St.3d 71,74, 523 N.E.2d 846, 849:
 "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. * * * In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. * * *".
(Citations omitted). See, also, Reynolds v. Goll (1996),75 Ohio St.3d 121, 124, 661 N.E.2d 1008, 1010.
In Davis v. Flickinger (1997), 77 Ohio St.3d 415, 420,674 N.E.2d 1159, 1163, the court further stated:
 " 'It is the role of a trial judge at a custody hearing to consider all relevant factors, and then reach a decision. That decision is based primarily on the best interests of the child, with all other concerns of secondary importance. Because the trial judge is in the best position to evaluate the child's best interests, a reviewing court should accord great deference to the decision of the trial judge. * * *.' "
(quoting Pater v. Pater (1992), 63 Ohio St.3d 393, 403,588 N.E.2d 794, 802 (Resnick, J., dissenting)).
In Ridenour, supra, the trial court had granted permanent custody of two siblings to Children Services, while reserving visitation rights to the children's paternal and maternal grandparents. Subsequently, the Ridenours, the children's foster parents, filed petitions to adopt the children. The trial court denied the Ridenours' request for adoption.
The Ohio Supreme Court reversed the trial court's decision denying the adoption petitions. The court concluded that the trial court abused its discretion by not finding that the adoption would be in the children's best interests. The court determined that the adoption was in the children's best interest because the evidence illustrated that the Ridenours provided the children with "the stability and continuity essential to healthy development." Id., 61 Ohio St.3d at 322,574 N.E.2d at 1058. The court noted that the children began living with the prospective adoptive parents "when they were mere infants and have been living with them on a continuous basis since that time." Id. The court stated:
 "If the children are adopted by the [prospective adoptive parents], the patterns of daily life, the mode of discipline, and the practical and spiritual rituals to which they have grown accustomed will remain constant. The emotional bonds which the children have formed with the members of the * * * family will remain intact."
Id.
The court further concluded that the trial court had "elevated" the grandparents' rights "over the best interest of the children." Id., 61 Ohio St.3d at 322, 574 N.E.2d at 1059. The court stated:
 "[V]isits with the grandparents upset the children and significantly altered their behavior. The trial judge himself noted as to both children that 'whenever such visits occur there is an emotional and physical disturbance with the child, a period of retesting of the adoptive parents by the child and at least several days to get the child back under the control of the adoptive parents.' * * * [T]he psychologists who interviewed the children prior to the adoption hearing recommended that grandparent visitation be curtailed, terminated temporarily or strictly supervised due to its apparent negative impact on the children's behavior."
Ridenour, 61 Ohio St.3d at 322-23, 574 N.E.2d at 1059.
In the case at bar, we find no abuse of discretion with the trial court's decision that the adoption would be in the best interests of Jessica and Maggie. Like Ridenour, the trial court specifically found that the children's visits with their mother were having an adverse effect upon their emotional well-being. Similarly, the trial court further found that appellees provided the children with a stable and nurturing home. As the court stated in In re Zschach (1996), 75 Ohio St.3d 648, 651,665 N.E.2d 1070, 1073: "Ultimately, the goal of adoption statutes is to protect the best interests of children. In cases where adoption is necessary, this is best accomplished by providing the child with a permanent and stable home * * *." See, also, Deems, supra (holding that the probate court did not abuse its discretion by granting the petitioner's petition for adoption when the evidence demonstrated that the children were being raised in a loving a stable environment and that their visitations with their natural father had been confusing and disconcerting to them).
We note appellant's concern that conflicting testimony exists as to whether the adoption would be in the children's best interests. Dr. Mason testified that he believed that the children's best interests would be served if they continued to have visitations with appellant, while Dr. Carver testified that the children's visits with appellant were having a detrimental effect upon their well-being.[3] The trial court apparently gave greater weight to Dr. Carver's testimony. As a reviewing court, it is not our province to second-guess the trial court's decisions regarding credibility. See Flickinger,supra; Miller, supra.
Appellant further asserts that the trial court's judgment is against the manifest weight of the evidence because ample evidence exists that she is a fit parent. Appellant notes that she has full custody of her youngest daughter, Chelsie, and has fulfilled all of her parental obligations with respect to Chelsie. We note, however, that:
 "The mere fact that a natural parent is fit, though it is certainly one factor that may enter into judicial consideration, does not automatically entitle the natural parent to custody of his child since the best interests and welfare of that child are of paramount importance. Willette v. Bannister (Ala.Civ.App. 1977), 351 So.2d 605, 607. Parental interests must be subordinated to the child's interest in determining an appropriate disposition of any petition to terminate parental rights. In re Perkins (Ind.App. 1976), 352 N.E.2d 502, 509."
In re Cunningham (1979), 59 Ohio St.2d 100, 106,391 N.E.2d 1034, 1038. The Cunningham court emphasized that parental rights " 'are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' In re R.J.C. (Fla.App. 1974), 300 So.2d 54, 58." Id., 59 Ohio St.2d at 106,391 N.E.2d at 1038.
In the case sub judice, our review of the record reveals that ample, competent and credible evidence supports the trial court's conclusion that adoption would be in the children's best interests. We find no abuse of discretion. The evidence demonstrates that appellees provided the children with a loving, stable home. Moreover, some evidence exists that the children's visits with appellant adversely affected them. While we note that the trial court was presented with conflicting evidence as to whether adoption would be in the children's best interests, as an appellate court we must defer to the trial court's conclusions regarding credibility. Our standard of review in adoption cases is extremely deferential, and we may not substitute our judgment for that of the trial court. SeeFlickinger, supra; Miller, supra; Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 461 N.E.2d 1273.
Finally, we recognize that the trial court was faced with a difficult decision. On one hand, the trial court heard evidence that the children's visits with appellant adversely affected their behavior. On the other hand, the guardian ad litem
recommended that the trial court deny the adoption petitions and that the children continue to visit with appellant. Adoption proceedings, by their very nature, present difficult issues. The trial court's decision permanently changes the child's life. The foregoing concerns, however, demonstrate the rationale underlying our deferential standard of review. As a court reviewing a cold record, we simply cannot substitute our opinion for that of the trial court. See Flickinqer, supra;Miller, supra.
Accordingly, based upon the foregoing reasons, we overrule appellant's second and third assignments of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court, Probate Division, to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, J. Evans, J.: Concur in Judgment Opinion
For the Court
 BY: ___________________________ Peter B. Abele Judge
 NOTICE TO COUNSEL
Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.
[1] We note that the clear and convincing evidence standard as it relates to adoption proceedings is used to determine whether a parent failed without justifiable cause to communicate with or to support the child. See, e.g., In re Bovett (1987), 33 Ohio St.3d 102,515 N.E.2d 919, paragraphs one and two of the syllabus. In Bovett, supra, the Ohio Supreme Court discussed the burden of proof as follows:
 "Pursuant to R.C. 3107.07(A), the petitioner for adoption has the burden of proving, by clear and convincing evidence, both (1) that the natural parent has failed to support the child for the requisite one-year period, and (2) that this failure was without justifiable cause. In re Adoption of Masa
(1986), 23 Ohio St.3d 163, 492 N.E.2d 140, paragraph one of the syllabus, followed.
 Once the petitioner has established, by clear and convincing evidence, that the natural parent has failed to support the child for at least the requisite one-year period, the burden of going forward with the evidence shifts to the natural parent to show some facially justifiable cause for such failure. The burden of proof, however, remains with the petitioner."
[2] R.C. 3107.161(C) provides:
A person who contests an adoption has the burden of providing the court material evidence needed to determine what is in the best interest of the child and must establish that the child's current placement is not the least detrimental available alternative.
[3] Appellant complains that Dr. Carver's based his testimony regarding the children's behavior on unproven sexual abuse allegations. Appellant states: "Dr. Carver assumed that the sexual abuse had occurred and that Susan Riley Conroy, if not actively participating in it, failed to protect the children from it, causing trauma to them." We note, however, that Dr. Carver recognized that the sexual abuse allegations were unsubstantiated. Nevertheless, Dr. Carver testified that based upon his interaction with the children, he concluded that the children had been subjected to some sort of trauma associated with appellant.
Although we recognize that Lawrence County Children Services could not substantiate the sexual abuse allegations and that the Lawrence County Grand Jury did not return an indictment against Clark for the sexual abuse allegations, we do not believe that Dr. Carver was prohibited from expressing his opinion that the children suffered some sort of trauma. In the case at bar, regardless of whether the trial court believed that appellant's ex-boyfriend sexually abused the children, Dr. Carver's testimony clearly indicated that the children's visits with appellant adversely affected their behavior. See, generally, Collins v. Sotka (1998), 81 Ohio St.3d 506, 517,692 N.E.2d 581, 588 (Moyer, J., dissenting) (stating that civil proceedings; In re Malone (May 11, 1994), Scioto App. No. 93 CA 2165, unreported.
Moreover, we note that Dr. Carver articulated other factors to support his conclusion that adoption would be in the children's best interest. Dr. Carver explained the reasons for his opinion that the adoption would be in the children's best interests as follows:
 " * * * [P]art of the opinion is based on the interaction that I see with the children. It's a warm, it's a loving relationship. The children don't have any type of obvious issue in being at the home of the grandparents. They both verbally indicate they want to be adopted. They told me that in the last session. SO there is * * * the bond is already there. Another thing we have s that Joe and Judy are able to deal with the issues that these children have been through and have primarily been the identified parents for this number of years that these children have been around. They have been the parental force and the parental stability for these children and for their best interests I would suggest that continue."