IN RE ADOPTION OF CHARLES B.

[Cite as In re Adoption of Charles B (1990), 50 Ohio St. 3d 88.]

(No. 88-2163—Submitted September 13, 1989—Decided March 28, 1990.)

*Porter, Wright, Morris & Arthur, Denise M. Mirman* and *David Goldberger*, urging reversal for *amicus curiae*, American Civil Liberties Union.

*Rhonda R. Rivera* and *Carol Ann Fey*, urging reversal for *amici curiae*, Gay & Lesbian Parenting Group of Central Ohio et al.

*C. Lyonel Jones*, urging reversal for *amicus curiae*, Institute for Child Advocacy.

*Per Curiam.* Before proceeding to the merits of this appeal, we must first dispose of a procedural issue.

R.C. 3107.06 provides:

"Unless consent is not required under section 3107.07 of the Revised Code, a petition to adopt a minor may be granted only if written consent to the adoption has been executed by all of the following:

"* * *

"(C) Any person or agency having permanent custody of the minor or authorized by the court to order consent[.]"

R.C. 3107.07 provides in pertinent part:

"Consent to adoption is not required of any of the following:

"* * *

"(F) Any * * * lawful custodian of the person to be adopted * * * who has failed to respond in writing to a request for consent, for a period of thirty days * * *[.]"

The trial court found that the consent of the agency was not required because the agency did not submit its statement withholding consent until after the statutory time limit had passed. The court of appeals agreed with the trial court on this point. We also agree. Appellee did not submit its objection within the time period set forth in R.C. 3107.07(F) and thus the consent of appellee is not, in this case,

*Robin Lyn Green*, for appellant petitioner.

*Radabaugh, Higgins & Rickrich* and *C. William Rickrich*, for appellant guardian ad litem.

*William B. Sewards, Jr.*, assistant county prosecutor, for appellee.

a condition precedent to the granting of the adoption.

The substantive issue before this court is whether Mr. B should be allowed to adopt Charles B. The court of appeals stated, in effect, that it could never be in a child's best interest to be adopted by a person such as Mr. B. We do not agree and, therefore, reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

R.C. 3107.02 sets forth who may be adopted. R.C. 3107.02(A) provides: "Any minor may be adopted." R.C. 3107.03 sets forth those persons who may adopt. R.C. 3107.03 provides in relevant part: "The following persons may adopt: * * * (B) An unmarried adult[.]"

Charles is included within R.C. 3107.02(A) and thus may be adopted. Mr. B is included within R.C. 3107.03(B) and is, therefore, *statutorily* permitted to adopt. Accordingly, pursuant to R.C. 3107.03(B), an unmarried adult in Ohio is an eligible person to adopt those persons specified in R.C. 3107.02.

Having so stated, we hasten to add that the right to adopt is not absolute. Both R.C. 3107.02 and 3107.03 use the discretionary word "may." Accordingly, we also hold that while an unmarried adult in Ohio is eligible to adopt, the right is permissive and not absolute as both R.C. 3107.02 and R.C. 3107.03 use the verb "may."

Having established that Mr. B is not statutorily precluded from adopting Charles and that in Ohio the right to adopt is not absolute, we must now determine whether the trial court was correct in allowing the adoption of Charles to go forward or whether the court of appeals was correct in prohibiting the adoption. Obviously, to make that determination in this case, as well as others, certain guidelines must be observed.

The polestar by which courts in Ohio, and courts around the country, have been guided is the best interest of the child to be adopted. This standard is applied in every adoption case and the case before us can be no different.

Further, each adoption matter must be judged on a case-by-case basis. Thus, R.C. 3107.14(C) provides:

"*If,* at the conclusion of the hearing, *the court finds* * * * that the adoption is in the best interest of the person sought to be adopted, it may issue * * * a final decree of adoption or an interlocutory order of adoption * * *." (Emphasis added.)

Thus, R.C. 3107.14(C) preserves the right of a trial court to grant or deny a petition for adoption based upon the evidence germane to each case.

Accordingly, we further hold that pursuant to R.C. 3107.14, adoption matters must be decided on a case-by-case basis through the able exercise of discretion by the trial court giving due consideration to all known factors in determining what is in the best interest of the person to be adopted.

In following this standard, we now decide whether the trial court abused its discretion in determining that it was in the best interest of Charles B to be adopted by Mr. B. Our review of the record before us, and some of our previous Ohio case law, leads us to the inescapable conclusion that the trial court made the right decision in approving the adoption of Charles by Mr. B.

The record discloses that Charles, although still a young boy, already has endured many emotional as well as physical hardships. Charles has had a neglected and abused childhood. His natural parents signed a voluntary permanent surrender of him. He has been in the permanent custody of appellee since April 1985. Although appellee originally attempted to place Charles

and his two sisters with one family, this plan was abandoned after appellee determined that individual placements would be better for Charles and his siblings.

The agency then developed a list of requirements for the family adopting Charles. These requirements were: a family of two parents with older siblings, at least one of which would be male; a family with a child-centered life style; a couple with definite parenting experience, preferably with adoption experience; parents with proven ability in dealing with behavior disorder issues; a family that is open to counseling; and a family that demonstrates an ability to deal with learning disabilities, speech problems and medical problems. A tall order, indeed.

In 1985, Charles was registered as an individual child available for adoption. In early 1987, Mr. B indicated to appellee his general interest in adopting a child, and Charles in particular. A supervisor of appellee's Family Services Unit indicated that if Mr. B had a home study completed, he would be given consideration to adopt Charles if no other final decision had been made prior to that time.

Several potential families were chosen by appellee for Charles. None of these potential adoptive families proved successful for Charles. In May 1987, appellee located a two-parent family for Charles. Appellee prepared both the family and Charles for eventual placement. Charles met the family in August 1987 but after several weeks, the family demonstrated, according to appellee, a "lack of commitment to adopting Charlie." Appellee, on October 1, 1987, decided not to place Charles with this family.

Throughout this time period, Mr. B's interest in adopting Charles never wavered. On December 18, 1987, Mr. B completed a pre-placement application wherein he expressed his desire to adopt Charles. On January 15, 1988, Mr. B filed a petition for the adoption of Charles in the Probate Division of the Court of Common Pleas of Licking County.

The record further discloses that Mr. B is aware of, and prepared to meet, Charles's physical and emotional problems. He has plans for Charles's medical care and education and has demonstrated an ability to discipline Charles when necessary. He also testified that he has accepted Charles as he is.

Witnesses called by Mr. B at the hearing testified that Mr. B has the necessary qualifications to be a good parent for Charles. The guardian stated that Mr. B and Charles have developed a close relationship and that Charles would like to make his home with Mr. B. The guardian further stated that Mr. B would have the support of his immediate family with sufficient female role models. The guardian concluded his report with a recommendation that the adoption be approved.

As previously indicated, as with all difficult questions concerning custody or adoption of children, trial courts must make decisions on the facts of each individual case. While we have never addressed the precise issue now before us, we, and other Ohio courts, have dealt with a number of cases involving custody of children. We find a review of some of those cases to be helpful in our current deliberations.

This court in *In re Burrell* (1979), 58 Ohio St. 2d 37, 12 O.O. 3d 43, 388 N.E. 2d 738, addressed whether two minor girls lacked proper parental care and supervision solely because their mother, with whom they lived, was also living with her boyfriend. We found that the evidence showed no conditions adverse to the normal development of the girls other than the fact that the mother lived with her boyfriend. We held:

"* * * [S]uch conduct is only significant if it can be demonstrated to have an adverse impact upon the child sufficiently to warrant state intervention. That impact cannot be simply inferred in general, but must be specifically demonstrated in a clear and convincing manner. * * *" *Id.* at 39, 12 O.O. 3d at 44, 388 N.E. 2d at 739.

The court of appeals in *Whaley* v. *Whaley* (1978), 61 Ohio App. 2d 111, 15 O.O. 3d 136, 399 N.E. 2d 1270, was called upon to decide whether a change in custody was warranted when the mother, who had custody of her daughter, was "romantically interested" in a married man whom she planned to marry after his divorce. The court, citing Lauerman, Nonmarital Sexual Conduct and Child Custody (1977), 46 U. Cin. L. Rev. 647, discussed four possible responses available to a trial court when a parent was engaged in nonmarital sexual conduct.[1] The court could find "* * * (1) it is conclusively presumed that the person is unfit to have custody or (2) it is rebuttably presumed that the person is unfit to have custody, or (3) it must be shown that such conduct has a direct adverse impact on the child, or (4) it is presumed that such conduct had a direct adverse impact on the child." *Whaley, supra,* at 115, 15 O.O. 3d at 138-139, 399 N.E. 2d at 1273.

The court of appeals in *Whaley, supra,* adopted the third response:

"The third standard, that immoral conduct must be shown to have a direct or probable adverse impact on the welfare of the child in order to justify a change of custody, we believe to be the rule in Ohio. We believe it to be the better standard." *Id.* at 118, 15 O.O. 3d at

---

[1] Lauerman's definition of "nonmarital sexual conduct" included homosexual activity. Lauerman, *supra,* at 648.

140, 399 N.E. 2d at 1275. The court found no evidence to support the trial court's decision to change custody of the girl. See, also, *Wyss* v. *Wyss* (1982), 3 Ohio App. 3d 412, 3 OBR 479, 445 N.E. 2d 1153 (immoral conduct or cohabitation of a custodial parent with a non-spouse may not form the basis for a change in custody unless there is a showing of a material adverse effect on the child); *Kraus* v. *Kraus* (1983), 10 Ohio App. 3d 63, 70, 10 OBR 73, 80-81, 460 N.E. 2d 680, 687 (change in custody not allowed where evidence did not show that custodial parent's live-in boyfriend had an adverse impact on children); *Conkel* v. *Conkel* (1987), 31 Ohio App. 3d 169, 31 OBR 335, 509 N.E. 2d 983 (homosexual father could not be denied overnight visitation with his two sons on the basis of his homosexuality without evidence that the boys would be psychologically or physically harmed thereby). But, see, *Roberts* v. *Roberts* (1985), 22 Ohio App. 3d 127, 22 OBR 328, 489 N.E. 2d 1067 (where only evidence before trial court in a visitation modification hearing shows that minor children will be harmed by exposure to father's homosexual life style, the trial court abuses its discretion in failing to impose conditions to safeguard children's welfare and best interest).

While we readily concede that these cases can be easily distinguished from the case at bar, we have, nevertheless, considered their principles along with a number of other factors in reaching our conclusion. We do, therefore, think it proper to set forth these decisions in our opinion because they at least illustrate our point that the test to be used in *any* adoption is the "best interest of the child" standard. If there is information available that shows or indicates that adoption of a particular child would not be in the child's best interest, then that evidence

should be presented at the adoption hearing.

What evidence was presented at the hearing? Appellee offered one witness. The witness, who is the Administrator of Social Services for appellee, testified that, except for a few classes in those areas, she had no formal education in either social work or psychology. She had met with Charles individually on only one occasion and for one hour. She had not observed Charles with Mr. B. The substance of her testimony concerned the fact that Mr. B did not meet appellee's "characteristic profile of preferred adoptive placement." Other than the information contained in the report on proposed adoption, appellee did not produce or introduce any other evidence. This was the entire case submitted on behalf of appellee's objection to the adoption. From appellee's standpoint, this is the record now before us.

In contrast, Mr. B himself testified and presented six other witnesses. These other witnesses were: (1) Dr. Joseph Shannon, who holds a Ph.D. in psychology, (2) Dr. Victoria Blubaugh, who also holds a doctorate in psychology, (3) Mr. B's mother, (4) Mr. B's sister, (5) Carol Menge, vice-president of Lutheran Social Services and herself an adoptive parent, and (6) Mr. K. Finally, the guardian ad litem gave an oral report recommending that the adoption be approved.

Dr. Shannon, a licensed psychologist, testified as a professional and, in addition, stated that he was acquainted with Mr. B and found his reputation to be beyond reproach. Dr. Blubaugh, also a licensed psychologist, testified that in her counseling role she had observed a bonding develop between Charles and Mr. B. She testified that it was in Charles's best interest to be adopted by Mr. B especially given the special needs of Charles. Mrs. Menge testified that an adoptive child with special needs requires an adoptive parent with stability and flexibility, and the willingness to seek needed services. Mr. B's mother and sister stated that Charles had become integrated into their family and that a relationship of grandmother-grandson and aunt-nephew had been developed with Charles. The guardian gave a detailed report to the court concerning his investigation of Mr. B, Mr. B's home, Mr. B's ability to parent and the wishes of Charles to be adopted by Mr. B before making his (the guardian's) recommendation in favor of the proposed adoption.

Given the state of the record before us, and accepting the proposition that in adoption proceedings the child's best interest is paramount, we now briefly review the law.

In *State, ex rel. Portage Cty. Welfare Dept.*, v. *Summers* (1974), 38 Ohio St. 2d 144, 67 O.O. 2d 151, 311 N.E. 2d 6, we stated that the refusal by an agency to consent to an adoption would not be conclusive. Instead, any recommendations and reports along with other evidence would be used by the court in deciding "(1) whether the petitioner is suitably qualified to care for and rear the child, and (2) whether the best interests of the child will be promoted by the adoption." *Id.* at 152, 67 O.O. 2d at 156, 311 N.E. 2d at 12. Thus, we held that the trial court properly exercised its discretion when it granted the petition for adoption over the welfare department's objection. We stated:

"Permanent placement in a judicially approved home environment through the process of adoption is clearly preferable to confining the child in an institution or relegating the child to a life of transience, from one foster home to another, until such time as the certified organization determines that

it is proper to give its consent to an adoption." *Id.* at 154, 67 O.O. 2d at 157, 311 N.E. 2d at 13.

*In re Haun* (1972), 31 Ohio App. 2d 63, 60 O.O. 2d 163, 286 N.E. 2d 478, discussed whether a petition for adoption was properly granted when the agency refused to consent solely because of the advanced age of the adopting parties. The court held:

"Obviously, a 'structured' agency system taking into account many factors before giving consent to adoption as urged by the professionals is of great importance * * *, but few standards in human affairs can be procrustean in application. In the light of the total evidence, and the singular emphasis on age as the key factor in denying consent, the denial in this case seems an example of a loss of the spirit of the *whole* adoption system while holding to the letter of *part* of it. The fault, the unreasonableness, the arbitrariness and the caprice, lie precisely with this extraordinary emphasis on a single negative factor in the face of remarkably unanimous opinion that by all other standards the appellees are outstandingly qualified to be adoptive parents." (Emphasis *sic*.) *Id.* at 70, 60 O.O. 2d at 166-167, 286 N.E. 2d at 482-483.

Thus, a trial court, when deciding whether to grant or deny a petition for adoption, must consider *all* relevant factors before determining what is in the child's best interest. Since the facts in each case will vary, and the advisability of permitting an adoption must be made on a case-by-case basis, the trial court must be allowed broad discretion in making the determination.

Upon review of the record now before us, we determine that the trial court did not abuse its discretion in granting the petition for adoption. "The term 'abuse of discretion' con-

notes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *State* v. *Adams* (1980), 62 Ohio St. 2d 151, 157, 16 O.O. 3d 169, 173, 404 N.E. 2d 144, 149. See, also, *Blakemore* v. *Blakemore* (1983), 5 Ohio St. 3d 217, 219, 5 OBR 481, 482, 450 N.E. 2d 1140, 1142, and *Miller* v. *Miller* (1988), 37 Ohio St. 3d 71, 523 N.E. 2d 846. There is no evidence in this record that the trial court's attitude was unreasonable, arbitrary or unconscionable. Accordingly, we find that the trial court did not abuse its discretion when it placed Charles with Mr. B for adoption.

The judgment of the court of appeals is reversed and the judgment of the trial court is reinstated.

*Judgment reversed.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WILSON and H. BROWN, JJ., concur.

RESNICK, J., dissents.

RICHARD K. WILSON, J., of the Second Appellate District, sitting for WRIGHT, J.

ALICE ROBIE RESNICK, J., dissenting. I respectfully dissent from the majority decision. However, I do not agree with the court of appeals wherein it found as a matter of law a homosexual is ineligible to adopt a minor. Existing Ohio law is very clear that a homosexual is not as a matter of law barred from adopting a child under R.C. 3107.03(B). When deciding whether to grant or deny a petition for adoption, a court must consider all relevant factors before determining what is in the child's best interest. The fact that the party seeking to become an adoptive parent is a homosexual

should not, in and of itself, be determinative. However, neither can it be ignored. When a homosexual seeks to adopt a minor, a trial court must have before it sufficient evidence to show that the prospective parent's homosexuality will not have an adverse effect on the minor. The prospective parent must present evidence demonstrating that his or her homosexuality will not harm the child. Likewise, the party opposing the adoption by the homosexual must also submit evidence establishing not only that the homosexuality of the adopting parent had or will have an effect on the child, but also that the effect is or will be harmful.

The facts of each case must be considered, allowing the trial court broad discretion in determining whether there exists a nexus between the homosexuality of the prospective adoptive parent and the adoption which could have an adverse effect on the child. Other jurisdictions, when confronted with a parent's homosexuality in a child custody or visitation context, which is a similar situation to the one before us, have used a "nexus test" or an affirmative showing of harm to the child caused by the parent's sexual orientation. See, e.g., In re Marriage of Birdsall (1988), 197 Cal. App. 3d 1024, 243 Cal Rptr. 287; S.N.E. v. R.L.B. (Alaska 1985), 699 P. 2d 875; Anonymous v. Anonymous (1986), 120 App. Div. 2d 983, 503 N.Y. Supp. 2d 466; D.H. v. J.H. (Ind. App. 1981), 418 N.E. 2d 286; Guinan v. Guinan (1984), 102 App. Div. 2d 963, 477 N.Y. Supp. 2d 830. Based on the facts of this case there does exist a nexus between the homosexuality of Mr. B and the adoption of Charles B which could adversely affect the child and thus would not be in the best interest of the child.

Charlie is presently eight years of age. Due to his many problems he may not be as mature as an average eight year old. Charlie's natural mother and alleged father both signed voluntary permanent surrender papers. His family history evinces neglect and abuse. Charlie was tested by the Licking County Department of Human Services and the results indicate that he has a low functioning range I.Q., possible brain damage, and deficits in fine and gross motor skills. But, most importantly, Charlie has leukemia which presently is in remission. The treatment which Charlie received for leukemia has altered his immune system. To place Charlie in an environment with a homosexual who is engaged in a homosexual relationship is not in the best interest of the child.

While I agree that homosexuality is just one factor to be considered by the court in adoption proceedings, it should be weighed along with all other factors and the ultimate decision must be based upon the best interest of the child. I also agree that a nexus must be found to exist between the sexual preference of the father and the adoption which could have an adverse effect on the child. In this case that nexus was well established by Dr. Frederick B. Ruymann, M.D., Director, Hematology Division; Professor, Department of Pediatrics, Children's Hospital, the Ohio State University, wherein he stated in a letter to the court dated April 13, 1988 that adoption of Charlie by a homosexual "* * * would, with our present knowledge place Charles at increased risk for exposure to HIV infection, i.e. infection with the AIDS virus. * * * Charles has an altered immune system. The AIDS virus attacks the immune system further destroying it."

Mr. B was aware of this problem and was tested, proving to be HIV negative. However, we must remember that adoption is not just for

today but forever. Mr. B falls within a high-risk population for AIDS. Why place a child whose immune system has already been altered in such an environment? It was best stated by Kathleen Handley, Administrator of Social Services for the Licking County Department of Human Services, at the hearing that "[o]ur feeling is that professionally it would be an adoption risk * * * to place a child in a setting where there is no practiced precedent to give us support. We do not view this as a child that needs experimentation. He has too many other issues that he has to conquer in his life."

This case is distinguishable from *Bezio* v. *Patenaude* (1980), 381 Mass. 563, 410 N.E. 2d 1207, and other cases which hold that the lesbian or homosexual relationship standing alone is insufficient to adversely affect the welfare of the child. I am aware of research on this issue which shows that homosexuals can be effective parents. See, *e.g.*, Note, Gay Parenting: Myths and Realities (1989), 9 Pace L. Rev. 129; Comment, Out of the Closet and into the Courts: Homosexual Fathers and Child Custody (1989), 93 Dickinson L. Rev. 401; and Comment, Homosexual Parenting: Child Custody and Adoption (1989), 22 U. Calif. Davis 1009. However, in this case not only do we have a homosexual relationship, but we also have a child who possesses mental and physical problems that could be exacerbated by this type of a life style.

In conclusion, Charlie thus far in his life has had many problems and there is nothing more that anyone would want for him than to be placed in a loving permanent home. But due to Charlie's many medical problems, a homosexual environment is not in his long-term best interest. I sincerely regret that the record in this case was not better developed by the appellee during trial. This was a difficult decision for the trial court to make and the manner in which it was tried on the part of the appellee made it even more difficult for the court. However, we are dealing with the life of an eight-year-old boy; therefore, the paramount concern is the well-being of this child. Because Charlie's immune system has been dramatically altered due to treatment for leukemia, in the long term, this adoption simply is not in his best interest. Therefore, I find that the trial court abused its discretion in granting the petition for adoption. I would affirm the court of appeals, however, not for reasons stated in its opinion but simply because Charlie is a very special little boy with unique and individual physical and mental problems. Thus, based upon those problems it is not in the best interest of Charlie to be adopted by Mr. B.