[Cite as *In re Adoption of P.K.H.*, 2019-Ohio-2680.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

|  |  |  |
|---|---|---|
| | : | |
| IN THE MATTER OF THE | : | Case No. 18CA3850 |
| | : | |
| ADOPTION OF P.K.H. | | DECISION & JUDGMENT ENTRY |
| | : | |

APPEARANCES:

Brigham M. Anderson, Ironton, Ohio, for Appellant.[1]

Andrew S. Hanes, Wheelersburg, Ohio, for Appellee.

CIVIL CASE FROM COMMON PLEAS COURT, PROBATE DIVISION
DATE JOURNALIZED: 6-19-19
ABELE, J.

{¶ 1} Tyler M.R. Hollar, petitioner below and appellant herein, appeals the Scioto County Common Pleas Court, Probate Division, judgment that denied his petition for the adoption of his stepson, P.K.H. Appellant raises the following assignments of error for review:

FIRST ASSIGNMENT OF ERROR:

"THE PROBATE COURT ERRED BY DENYING THE PETITION FOR ADOPTION WHEN NO MATERIAL EVIDENCE WAS PUT FORTH BY THE APPELLEE AS REQUIRED BY O.R.C. SECTION 3107.161(C) REGARDING THE BEST INTEREST DETERMINATION AND APPELLEE FAILED TO PROVE THAT THE CHILD'S CURRENT PLACEMENT IS NOT THE LEAST DETRIMENTAL AVAILABLE ALTERNATIVE."

SECOND ASSIGNMENT OF ERROR:

---

[1] Different counsel represented appellant during the trial court proceeding.

"THE PROBATE COURT ERRED IN DENYING APPELLANT'S PETITION FOR ADOPTION AS SUCH IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 2}   On February 27, 2015, appellant filed a petition to adopt P.K.H., his minor stepson.   In his petition, appellant alleged that the biological father's consent is not required because, for a period of at least one year immediately preceding the filing of the adoption petition, the child's biological father failed, without justifiable cause, to: (1) have more than de minimis contact with the child, and (2) provide for the child's maintenance and support as required by law or judicial decree.

{¶ 3}   At the October 21, 2015 hearing, the trial court found that the child's biological father, Jeremy Tyler Booker, the respondent below and appellee herein, filed his objection to the adoption eleven days late.   Thus, because appellee's consent was not necessary under R.C. 3107.07(K), the court proceeded to the best interest hearing.

{¶ 4}   At the best interest hearing, appellee testified that he met P.K.H.'s mother, Tyler Ann Hollar (Mrs. Hollar), in 2008, approximately one year prior to P.K.H.'s birth.   Later, appellee was away for military training, but came home to see P.K.H. before appellee's year long deployment the following month.   Appellee testified that he has been deployed on active military duty three times, twice after P.K.H.'s birth.   During appellee's deployment, he maintained medical insurance for the child[2] and he and Mrs. Hollar kept in communication.   When appellee returned from deployment, he testified that he visited P.K.H. and that contact remained civil between appellee and Mrs. Hollar. When appellee later married Joannie Book (Mrs. Book), the Books continued to visit P.K.H., and Mrs. Book, the appellee's son M.B., and appellee's mother also attended the Hollars' wedding.

---

[2]   Respondent's Exhibit 3, an agreed child and medical support entry, states that appellee pays no child

{¶ 5}    Appellee stated that their informal visitation arrangement worked well until his last deployment around 2014, when things soured.  Appellee testified that he saw P.K.H. on May 12, 2014 and then "tried to get him a couple of times after that and they always had plans and then I talked to him on his birthday and that was it."   Appellee wanted to see P.K.H. once more before his deployment, but Mrs. Hollar did not allow it.  Appellee stated that he had been friends with Mrs. Hollar on Facebook prior to his deployment, but after his 2014 deployment, Mrs. Hollar blocked him.  Eventually, appellee and his wife consulted an attorney who advised them to wait until appellee returned from his deployment.  When appellee returned, he and his wife asked an attorney to send the Hollars a letter to attempt to establish parenting time outside the court system.  Appellee, however, did not receive a response to his letter, but instead received service of the petition to adopt P.K.H.

{¶ 6}    Appellee's wife, Joannie Book, testified that she and appellee met through the military and married in 2013.  Mrs. Book, a National Guard recruiter, last saw P.K.H. in May 2014 when appellee prepared for his third deployment.  Mrs. Book testified that appellee's visits with P.K.H. were "on their terms, at their convenience, at their home."   Mrs. Book explained that at one point, she was friends with P.K.H.'s mother and would take her step-son, M.B., to visit P.K.H. so they "can maintain a relationship as brothers."   Mrs. Book also testified about going to the Columbus Zoo with her husband (appellee), the Hollars and P.K.H.  Mrs. Book's friendship with Mrs. Hollar "decreased when visitation [with P.K.H.] dissolved" in 2014.  Mrs. Book testified that when her husband deployed in May 2014, Mrs. Hollar blocked her and appellee from contacting her

---

support, but provides insurance coverage under his private insurance.

or from viewing her Facebook social media profile. Mrs. Book also stated that she and appellee decided to wait until he returned from his deployment to retain legal counsel to seek visitation with P.K.H.

{¶ 7} Appellee's mother, Teresa Book, testified that she attended several events including one of P.K.H.'s birthday parties, a soccer game, and appellant's wedding to Mrs. Hollar. Teresa explained that she sees appellee's other son, M.B., several times per week and would like to see P.K.H. more often. She also stated that appellee had been a "Godsend" for her granddaughter, who had been placed with appellee, and added that appellee's wife's interactions with P.K.H. were "a joy to watch."

{¶ 8} Ten-year-old M.B., appellee's son and P.K.H.'s half-brother, testified that he and P.K.H. liked to climb trees and play kick ball, tag, and hide-and-seek. M.B. also stated that had not seen P.K.H. in about a year and a half and that he missed him.

{¶ 9} Assistant County Prosecutor Shane Tieman testified that he had been appointed as the guardian ad litem for appellee's other son, M.B., during a custody case that involved appellee and M.B.'s biological mother, Christy Sparks. In that case, Tieman conducted an investigation and filed a report. Tieman testified that, subsequent to that interaction, he became more familiar with appellee through community and school activities, such as Cub Scouts and sporting events, because M.B. and Tieman's son are the same age. Tieman stated that appellee and his wife provide good structure, are dependable, made M.B. follow rules and respect them, as well as his mother, and are active in M.B.'s school and extracurricular activities.

{¶ 10} Scioto County Children's Services Caseworker Naomi Kinsel testified that she is the ongoing caseworker for appellee's niece, who had been placed with appellee. Kinsel stated that

appellee and his wife are appropriate with the niece, as well as with appellee's son, M.B., and that appellee and his wife have been drug screened and have had a home safety audit.

{¶ 11} Appellee's friend, Shane Hatfield testified and stated that he has known appellee "since he was born probably," and that he and appellee served in the military together and had been deployed together to Iraq in 2009-2010 where appellee had served as team commander. Hatfield stated that appellee is a great father to M.B., but that he had not observed interaction with P.K.H.

{¶ 12} The best interest hearing continued on January 27, 2016. Evan Washburn testified that he had known appellee for four and a half years and had served as appellee's commanding officer in the Army National Guard during appellee's last deployment to Afghanistan. Washburn explained that during their deployment, he requested appellee to take a position as platoon sergeant "because of what I'd seen and the potential in him to do that job."

{¶ 13} Tara Boyer testified that she has known appellee for thirteen years and became friends with him and his wife through her husband. Boyer testified that she observed appellee with his son, M.B. over the past four or five years during several week-long family vacations and other visits.

{¶ 14} Tyler Ann Hollar, mother of P.K.H. (and appellant's wife), testified that appellee had not been ordered to pay child support through the court, but instead he had agreed to make a $275 per month direct deposit into her account. Mrs. Hollar testified that the payments stopped in December 2013 and appellee told her that he discontinued the payments because he could no longer see P.K.H. consistently. Mrs. Hollar also testified that she did not block Mrs. Book from her Facebook, but rather had deactivated her Facebook account on multiple occasions. However, Mrs. Hollar did testify that she "unfriended" appellee when she saw a photo on his Facebook page of him building a tree house for his son, M.B. Mrs. Hollar testified that she did not unfriend appellee to

stop him from seeing her posts, but because she did not want to see his. Mrs. Hollar also testified that she and P.K.H. participated in appellee's wedding to Mrs. Book.

{¶ 15} Mrs. Hollar testified that in 2010 she and appellant became engaged, and their son, G.H., was born in 2012. Mrs. Hollar explained that appellant is a great father and treats P.K.H. the same as G.H. Mrs. Hollar stated that appellant picks P.K.H. up from school, has coached his teams, and is very involved in his life. Mrs. Hollar said when P.K.H. began calling appellant "daddy" or "dada," she did not correct him because appellee had never been involved in P.K.H.'s life and she was unsure if he would ever be a part in P.K.H.'s life. Mrs. Hollar also testified that P.K.H. has some indications of sensory processing disorder and/or obsessive compulsive disorder and that if appellee were to be granted parenting time, it "would open up a whole new can of worms for him that, you know, he [P.K.H.] doesn't deserve. Um, I feel like he would be confused once again, um, and as far as consistency, I'm not sure in a year or two down the road that Mr. Book would not be deployed again or leave work or leave the town for pipefitting job or something like that." Mrs. Hollar also stated she would like appellee's name to be removed from P.K.H.'s birth certificate and, instead, substitute appellant's name.

{¶ 16} Mrs. Hollar's niece, Christian Livingston, and other friends of Mrs. Hollar and appellant including Amanda Eldridge, Vanessa Tuttle, Megan Flannery, Maddison Enz, Ashley Schwamberger, along with appellant's brother, Dirk Hollar, all testified that appellant has a great relationship with P.K.B., has been a positive influence in his life and that they favor the adoption. Furthermore, clinical counselor Leasa Mowery testified that she was the adoption assessor for the Hollars and that appellant appeared to be a father-figure to P.K.H.

{¶ 17} Finally, appellant testified that he entered P.K.H.'s life when he was approximately

six months old and that he has treated P.K.H. the same as his son, G.H.   Appellant also discussed

P.K.H.'s sensory issues, the things they do together, coaching P.K.H. in various sports, and stated

that appellant is the only person P.K.H. has known as a dad because appellant has raised him and has

been present at every significant moment of P.K.H.'s life.

{¶ 18} The trial court also conducted an in camera interview with P.K.H. on September 13,

2016.   On October 5, 2016, after a review of the evidence, the trial court denied the adoption

petition.   On November 2, 2016, appellant filed a motion for new trial.   On January 19, 2018,[3] the

trial court denied the motion for new trial and reaffirmed the court's prior decision.   On August 20,

2018, the court issued its findings of fact and conclusions of law.   On September 7, 2018, the court

issued a judgment that denied the motion for new trial and incorporated the prior decisions.   This

appeal followed.

I.

{¶ 19} In his first assignment of error, appellant asserts that the trial court erred by denying

the petition for adoption when the appellee put forth insufficient evidence, as R.C. 3107.161(C)

requires, regarding the best interest determination and evidence to prove that the child's current

placement is not the least detrimental available alterative.   In his second assignment of error,

appellant asserts that the trial court's decision to deny his petition for adoption is against the manifest

weight of the evidence.   Because appellant's two assignments of error raise related issues, for ease

of discussion we will consider them together.

---

[3]   The trial court's September 8, 2018 entry that denied appellant's motion for new trial on the grounds of
newly discovered evidence (the passage of time) stated that the reason for the delay in ruling on the motion for new
trial is that the probate court judge also serves as the juvenile court judge, and the case load in juvenile court had
increased from 222 to 548 over a two and a half year period due to the opioid crisis in Scioto County.

{¶ 20} "[A]doption matters must be decided on a case-by-case basis through the able exercise of discretion by the trial court giving due consideration to all known factors in determining what is in the best interest of the person to be adopted." *In re Adoption of Charles B.*, 50 Ohio St.3d 88, 90, 552 N.E.2d 884 (1990). A trial court enjoys considerable discretion in determining whether an adoption is in the child's best interest. *Id.* at 94, 552 N.E.2d 884. Thus, absent an abuse of discretion, a reviewing court may not reverse a trial court's decision concerning an adoption petition. An abuse of discretion implies more than an error of law or of judgment. Rather, an abuse of discretion suggests that the trial court acted in an unreasonable, arbitrary, or unconscionable manner. *In re Jane Doe I.,* 57 Ohio St.3d 135, 566 N.E.2d 1181 (1991); *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). Furthermore, an appellate court should not substitute its judgment for that of the trial court when competent, credible evidence supports the trial court's decision. *In re Adoption of G.D.C.,* 2017-Ohio-8302, 98 N.E.3d 882, ¶ 18, (4th Dist.); *In re Adoption of Deems*, 91 Ohio App.3d 552, 558, 632 N.E.2d 1347 (3d Dist.1993); *Trickey v. Trickey*, 158 Ohio St.9, 13, 106 N.E.2d 772 (1952). Finally, as the court held in *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988):

> The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. * * * In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. * * *

(Citations omitted.)

{¶ 21} "When an appellate court reviews whether a trial court's decision is against the manifest weight of the evidence, the court weighs the evidence and all reasonable inferences,

considers the credibility of witnesses and determines whether in resolving conflicts in the evidence,

the fact finder clearly lost its way and created such a manifest miscarriage of justice that the

judgment must be reversed." *See Martin v. Jones*, 2015–Ohio–3168, 41 N.E.3d 123, ¶ 68 (4th

Dist.), citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 20;

*Pinkerton v. Salyers*, 4th Dist. Ross No. 13CA3388, 2015–Ohio–377, ¶ 18, citing *In re M.M.*, 4th

Dist. Meigs No. 14CA6, 2014–Ohio–5111, ¶ 22.   Generally, an appellate court will presume that a

trial court's findings are accurate and will reverse a judgment as being against the manifest weight of

the evidence only in the exceptional case in which the evidence weighs heavily against the judgment.

 *Martin* at ¶ 68. *In re Adoption of K.N.W.*, 4th Dist. Athens Nos. 15CA36, 15CA37,

2016–Ohio–5863, ¶ 27.

{¶ 22} R.C. 3107.161(C) provides:

> A person who contests an adoption has the burden of providing the Court material
> evidence needed to determine what is in the best interest of the child and must
> establish that the child's current placement is not the least detrimental alternative.

{¶ 23} In the case sub judice, appellant argues that a review of the transcript of the

proceedings shows that the biological father, appellee, failed to satisfy his burden to show that a

denial of the adoption petition is in the child's best interest, that the child's current placement is not

the least detrimental available alternative and that the court's decision is against the manifest weight

of the evidence.

{¶ 24} Our review of the proceeding reveals that, among the trial court's findings, the court

indicated that (1) the appellee and P.K.H. live approximately five to ten minutes from each other and

in the same school district; (2) appellee continues to provide health insurance coverage to the child;

(3) appellee paid approximately $275 per month to P.K.H.'s mother until January of 2014 as child

support, despite no formal obligation to do so; and (4) appellee is a member of the U.S. Army National Guard and was twice deployed after the child's birth. The court also found that appellee and various witnesses testified that the child had established a loving relationship with appellee and his family, and that the relationship between appellee and his family and appellant and his family was "so good that the stepmother was invited to, and attended, the wedding between the mother and the appellant stepfather." The court found that appellee and his family continued to see P.K.H. on a weekly basis from January of 2014 until May of 2014 when appellee was deployed to Afghanistan.

{¶ 25} The trial court also noted that appellee "attempted via text messages and telephone calls to visit the minor child again before the deployment but was rebuffed by the natural mother of the minor child." The court pointed out that appellee called and spoke with P.K.H. on his birthday on May 20, 2014, but around the time of the May 2014 deployment, P.K.H.'s mother "unfriended" appellee on Facebook due to being upset over a picture of a tree house that appellee had constructed for P.K.H.'s half-brother. The court also observed that when appellee returned from deployment in December 2014, he decided to use the court system to establish parental rights and parenting time with P.K.H. The court concluded that the relationship between appellee and his child "is a positive one that should be preserved rather than extinguished."

{¶ 26} Appellant contends that appellee's involvement with P.K.H. has been sporadic. Appellee, however, asserts that he has made multiple attempts to remain in contact with P.K.H., but the contact has been at the convenience of, and within the total control of, appellant and Mrs. Hollar. While it is accurate that appellee has been away, often due to military deployments and his occupation as a pipefitter, the extended family situation was very civil and functional to the extent that the parties, including Mrs. Hollar, appellant, appellee and his wife and their respective children

and extended families had interacted, attended family events, and traveled together. While many of the witnesses could only provide testimony of their observations of appellee's interaction with his niece and other son, we agree with the trial court that appellee presented substantial evidence, including the in camera interview of P.K.H., to show that the denial of the adoption petition is in the best interest of P.K.H. and that it is the least detrimental alternative to P.K.H.

{¶ 27} R.C. 3107.161(B) provides eleven factors for a trial court to consider in determining the best interest of a child in a contested adoption proceeding, which we address in turn:

*"1) The least detrimental available alternative for safeguarding the child's growth and development;"* R.C. 3107.161(B)(1).

{¶ 28} Appellant contends that the evidence is overwhelming that appellant and Mrs. Hollar have raised P.K.H. and that appellant is the only father P.K.H. has known. The trial court observed that P.K.H. was born May 20, 2010 to Tyler Ann (Mrs. Hollar) and Jeremy Tyler Book, appellee. The parties separated before P.K.H.'s birth, and appellee returned briefly when P.K.H. was born. Appellant entered P.K.H.'s life when P.K.H. was six months old.

{¶ 29} As the trial court noted it had two alternatives - to grant or to deny the adoption, and the court focused on some of Mrs. Hollar's actions taken prior to the filing of the adoption petition. "Her actions made it more difficult for [appellee] to share time with his son. Her actions of denying [appellee] time with his son were harmful. She was selfish in the regard. [Appellee] on the other hand has been selfless in this regard."

{¶ 30} R.C. 3107.161 (A) defines the phrase "the least detrimental available alternative" as "the alternative that would have the least long-term negative impact on the child." In examining this factor, the court stated that P.K.H. gets along well with everyone and the difficulty seemed to be

more with his mother being "annoyed about having to explain to [P.K.H.] that [appellant] is not his father, that [appellee] is his father, and that [appellee's] military commitments and pipefitting job take him away often and for significant periods of time." The court concluded that "the least detrimental available alternative as defined by the statute is a denial of the adoption and the preservation of all of P.K.H.'s relationships." If the biological father's involvement in the child's life will benefit the child, as the trial court determined, the adoption is not the least detrimental available to help with the child's growth and development.

*"(2) The age and health of the child at the time the best interest determination is made and, if applicable, at the time the child was removed from the home;" R.C. 3107.161(B)(2).*

{¶ 31} P.K.H. was six-years old at the time of the proposed adoption and is in good health. The trial court stated, "[t]he Court has no concern about [P.K.H.'s] health and considers it a neutral factor. The Court has also considered his age and maturity. The Court feels that he will be able to adjust no matter the Court's decision. He will remain in his mother's home either way. His age is also a neutral factor."

*"(3) The wishes of the child in any case in which the child's age and maturity makes this feasible;" R.C. 3107.161(B)(3).*

{¶ 32} The trial court interviewed P.K.H. on September 13, 2016 and considered P.K.H.'s wishes in denying the adoption petition. The court stated, "[P.K.H.] was well mannered, well groomed, and very articulate. He was not distracted at all by his unfamiliar surroundings. He did not stray off topic in our discussions. He was clear in his desires and explained very well why he had them. His wishes were well reasoned." The court indicated that P.K.H.'s wishes would be kept confidential and the court had given P.K.H.'s wishes an equal or greater weight than the other factors under consideration.

*"(4) The duration of the separation of the child from a parent;" R.C. 3107.161(B)(4).*

**{¶ 33}** P.K.H. has always resided with his mother, Mrs. Hollar. The evidence showed that appellee last saw P.K.H. around May 12, 2014. As noted above, appellee serves in the military and sought to reestablish visitation upon his return from his last deployment just prior to appellant filing the petition for adoption in 2015. The trial court viewed this factor this way, "[P.K.H. and appellee] had frequent contact in May of 2014 immediately before his father's last deployment. He will not be separated from his mother whether or not this adoption is granted. He will be permanently separated from his father, and his father's family if it is granted. He will not be, if it is denied."

*"(5) Whether the child will be able to enter into a more stable and permanent family relationship, taking into account the conditions of the child's current placement, the likelihood of future placements, and the result of prior placements;" R.C. 3107.161(B)(5).*

**{¶ 34}** As the appellee points out, P.K.H. will continue to enjoy a stable and permanent relationship with appellant and Mrs. Hollar despite the denial of the adoption petition. The denial of the petition only allows P.K.H. to enter into a more stable and permanent family relationship with appellee and his family while minimally impacting P.K.H.'s relationship with appellant and his family. The probate court stated, "[P.K.H.] lives with his mother. He has done so his entire life. The likelihood of any change in his placement is very slim. There have been no prior placements. The denial of this adoption will not likely destabilize his family relationships. The granting of adoption would cut off any future possibility of a custody change from [P.K.H.'s] mother to [P.K.H.'s] father."

*"(6) The likelihood of safe reunification with a parent within a reasonable period of time;" R.C. 3107.161(B)(6).*

**{¶ 35}** As the trial court observed, since this matter is a step-parent adoption petition,

reunification is not an issue as P.K.H. has always been in the custody of Mrs. Hollar.

*"(7) The importance of providing permanency, stability, and continuity of relationships for the child;"   R.C. 3107.161(B)(7).*

{¶ 36} When contemplating the stability and permanence of P.K.H.'s family, the court noted that the denial of this adoption would not likely destabilize P.K.H.'s family relationships, but the granting of the adoption would eliminate any future possibility of a custody change from P.K.H.'s mother to his father.   The court noted that appellee testified that he did not intend to seek custody, but rather, "is only seeking regular visitations with his son" and "will respect the Hollars."   The court also noted that "[a]ll parties agree that at one time they all got along well together in the current situation.   They even attended each other's weddings, dined together and went on day trips together."

{¶ 37} The court concluded that P.K.H. is fortunate to have parents who have married well and step-parents who are wonderful people.   The court added: "This matter is unusual in that no testimony was presented by any witness about anything negative about the other people in [P.K.H.'s] life."   We, incidentally, wholeheartedly agree with the trial court's commentary about this situation.   The court indicated that the mother complained only about the appellee being "in and out" of the child's life and that the appellee's visits "disrupted her family plans."   The court acknowledged that the Hollars informed P.K.H. that appellant is his father and appellee is his uncle, and appellee has deferred to the mother on this issue, perhaps to appellee's own detriment.

*"(8) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;"   R.C. 3107.161(B)(8).*

{¶ 38} Appellant argues that appellee failed to show that he and his family have taken an active role in P.K.H.'s life, arguing that appellee never showed any initiative to be involved in

P.K.H.'s life until the adoption petition was filed. However, the trial court considered the evidence and testimony and concluded that appellee and his family have a good relationship with P.K.H., "[b]y all accounts, [P.K.H.'s] interactions and interrelationships with his parents, siblings, and grandparents are good. Nothing was suggested as being wrong or bad between him and extended members. [P.K.H.] gets along well with everybody." While it is clear that appellant and Mrs. Hollar have raised P.K.H. and have spent far more time with P.K.H. than appellee, and it is true that appellee's military service and occupation as a pipefitter cause him to be away for extended periods of time, granting the adoption petition would terminate the relationship P.K.H. has with his father, appellee, his stepmother, his half-brother, and his paternal grandparents, all of which he enjoys. As the trial court stated, "[a]ll children should have permanency, stability, and a continuity of relationships. Since this is a step-parent adoption, permanency, and stability are present whether the adoption is granted or denied. * * * The continuity of those relationships will remain either way this goes. [P.K.H.] will continue to live with them. The granting, however, of the adoption will terminate P.K.H.'s relationship with his father, his step-mother, his paternal grandparents, and his brother, [M.B.]"

*"(9) The child's adjustment to the child's current home, school and community;" R.C. 3107.161(B)(9).*

{¶ 39} As indicated above, appellee testified that he is not seeking custody of P.K.H. The trial court acknowledged that, "[P.K.H.]is adjusted well to his current home, school and community. None of these will change whether this adoption is granted or denied."

*"(10) The mental and physical health of all persons involved in the situation;" R.C. 3107.161(B)(10).*

{¶ 40} Both parties agree that no material evidence was presented in this matter concerning the mental and/or physical health of the persons involved in the situation, as the trial court concluded.

*"(11) Whether any person involved in the situation has been convicted of, pleaded guilty to, or accused of any criminal offense involving any act [relating to children]." R.C. 3107.161(B)(11).*

{¶ 41} Again, this factor does not apply, as the trial court acknowledged.

{¶ 42} In our view, after our review of the record, we believe that appellant has failed to show that the probate court's judgment constitutes an abuse of discretion. Here, the court thoroughly considered all evidence and testimony, including the wishes of the child and all factors in R.C. 3107.161(B), and concluded that appellee established that the adoption was not in the best interest of P.K.H. and that P.K.H.'s current placement also is not the least detrimental available alternative to the child. We also fully agree with the court's sentiment that this case involves two sets of parents who care about, provide for, and love P.K.H. - it is abundantly apparent that no bad actors are involved. More important, the court concluded that P.K.H. is well adjusted and cares about and enjoys his relationship with the appellant and Mrs. Hollar, as well as appellee and his wife and family. We readily conclude after our review of the evidence that the probate court did not abuse its discretion in denying this petition for adoption. Considering the testimony, the in camera interview, and the trial court's broad discretion, we also conclude that the court's denial of the adoption petition is not against the manifest weight of the evidence. Ample competent, credible evidence adduced during the hearing supports the trial court's determination.

{¶ 43} Accordingly, based upon the foregoing reasons we overrule appellant's two assignments of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Probate Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

## NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.